

SECRETARY OF LABOR,
    Complainant,

     v.

TCP SPECIALISTS, LLC,
    Respondent.

Docket No. 23-1002

## NOTICE OF DECISION

1.  Enclosed is a copy of my decision. The entire record, including this decision, shall constitute the report of this Administrative Law Judge pursuant to section 12(j) of the Occupational Safety and Health Act of 1970 (the "Act"), 29 U.S.C. § 661(j). The Judge's report, which includes this decision, will be filed with the Commission's Executive Secretary on **Friday, May 09, 2025.** *See* Commission Rule 90(b), 29 C.F.R. § 2200.90(b).

2.  The Executive Secretary will then issue a "Notice of Docketing of Administrative Law Judge's Decision" that notifies all parties of the date that the Executive Secretary dockets the Judge's report, and that will state the date by which a party must file a petition for discretionary review.

3.  *Commission final order.* The decision shall become a final order of the Commission thirty (30) days from the date the Executive Secretary dockets the decision unless a Commission member directs review of the Decision within that time. *See* Section 12(j) of the Act; Commission Rule 90(f), 29 C.F.R. § 2200.90(f).

4.  *Party adversely affected or aggrieved by the decision.* A party adversely affected or aggrieved by the decision of the Judge may seek review by the Commission by filing a petition for discretionary review with the Executive Secretary at any time following the serviced of the judge's decision on the parties but no later than 20 days after the date of docketing of the Judge's report. Commission Rule 91(b), 29 C.F.R. § 2200.91(b). The Executive Secretary's address is as follows:

**Executive Secretary**
**Occupational Safety and Health Review Commission**
**One Lafayette Centre**
**1120 20th Street NW, Suite 980**
**Washington, D.C. 20036-3457**

The full text of the rule governing the filing of a petition for discretionary review is Commission Rule 91, 29 C.F.R. § 2200.91.

5.  *Correction of errors in the Judge's report.* Requests to correct clerical errors arising through oversight or inadvertence in the decision or in other parts of the Judge's report shall be filed with the undersigned Judge, by motion, pursuant to Commission Rule 90(b)(4)(i), 29 C.F.R. § 2200.90(b)(4)(i). Motions shall conform to Commission Rule 40, 29 C.F.R. § 2200.40.

6.  *Relief from default.* Requests for relief from default or for reinstatement of the proceeding may be filed with the undersigned Judge, by motion, until the date the Executive Secretary dockets the Judge's report. *See* Commission Rule 90(c), 29 C.F.R. § 2200.90(c). Motions shall conform to Commission Rule 40, 29 C.F.R. § 2200.40.

7.  *Filing with Executive Secretary.* Except for motions filed to correct errors in the Judge's report, discussed in paragraph 4 above, on or after the date the Executive Secretary dockets the Judge's report, all documents shall be filed with the Executive Secretary. *See* Commission Rule 90(d), 29 C.F.R. § 2200.90(d).


/s/
JOHN B. GATTO, Judge

Dated: April 28, 2025
        Atlanta, GA



SECRETARY OF LABOR,[1]

        Complainant,

        v.

TCP SPECIALISTS, LLC,

        Respondent.

Docket No. 23-1002

## DECISION AND ORDER

**Appearances:**

Allyson D. Gault, Attorney, Office of the Solicitor, U.S. Department of Labor, Dallas, TX, for Complainant.

Brian L. Hurt, Darren S. Harrington, Attorneys, Steptoe & Johnson PLLC, Dallas, TX, for Respondent.

**BEFORE**: John B. Gatto, United States Administrative Law Judge

## I. INTRODUCTION

Two workers died and three others were injured when a pipe ruptured at a gas well in South Texas. The United States Department of Labor, through the Occupational Safety and Health Administration ("OSHA"), investigated the accident and issued[2] a serious citation and proposed penalty of $6,250.00 to TCP Specialists, LLC, a Louisiana-based wireline services contractor. The

---

[1] On March 10, 2025, Lori Chavez-DeRemer was sworn into office as the Secretary of Labor and is automatically substituted *sub nom.* for the former Acting Secretary. *See* Fed. R. Civ. P. 25(d). "Unless the Commission has adopted a different rule, its proceedings shall be in accordance with the Federal Rules of Civil Procedure." 29 U.S.C. § 661(g). The Commission has not adopted a different rule regarding substitution of parties.

[2] The Secretary of Labor has assigned responsibility for enforcement of the Act to OSHA and has delegated her authority under the Act to the Assistant Secretary for Occupational Safety and Health, who heads OSHA. *See* Order No. 8-2020, Delegation of Authority and Assignment of Responsibility to the Assistant Secretary for Occupational Safety and Health, 85 Fed. Reg. 58393 (Sept. 18, 2020), *superseding* Order No. 1-2012, 77 Fed. Reg. 3912 (Jan. 25, 2012). The Assistant Secretary has authorized OSHA's Area Directors to issue the citations and proposed penalties. *See* 29 C.F.R. §§ 1903.14(a) and 1903.15(a). The terms "Secretary" and "OSHA" are used interchangeably herein.

Secretary alleges TCP violated section 5(a)(1) of the Occupational Safety and Health Act of 1970 ("the Act"), 29 U.S.C. §§ 651–678, commonly known as the "general duty clause."[3] After TCP timely contested the citation, the Secretary filed a complaint with the Commission ("Court") seeking an order affirming the citation and proposed penalty.[4] Compl. at 2; s*ee also* Pretrial Order, Attach. C ("Stip. Fact") ¶4. The Court held a 3-day trial.

Based upon the record, the Court concludes it has jurisdiction over the parties and subject matter in this case under section 10(c) of the Act, 29 U.S.C. § 659(c). Pretrial Order ¶3; *see also* Stip. Fact ¶1. The Court also concludes TCP is an employer engaged in a business affecting interstate commerce within the meaning of sections 3(3) and 3(5) of the Act. Stip. Fact ¶2. Pursuant to section 12(j) of the Act and Commission Rule 90(a)(1), after hearing and carefully considering all the evidence and the arguments of counsel, the Court issues this Decision and Order, which constitutes its final disposition of the proceedings.[5] 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(a)(1). For the reasons indicated *infra*, the Court **AFFIRMS** the citation and **ASSESSES** a penalty of $6,250.00.

## II. BACKGROUND

The Blackstone B1 well was a horizontal gas well located in San Augustine County, Texas, (the "worksite") operated by C6 Operating, LLC. Stip. Fact ¶6. In October 2022, production from the well dropped and C6 hired contractors to perform a workover.[6] Stip. Fact ¶7. Brammer Engineering, Inc. was hired to provide an onsite company man, Hershell "Buster" Sullivan, and Sullivan supervised and directed the workover operations. Stip. Fact ¶ 8. TCP was hired to provide

---

[3] The general duty clause requires each employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1).

[4] The complaint and citation were amended "to clarify the feasible means of abatement identified in the original citation[.]" Mot. to Am. Cit. and Compl. at 2; *see also*, Order Grant'g Mot. to Am. Compl. and Cit.

[5] If any finding is in truth a conclusion of law, or if any stated conclusion is in truth a finding of fact, it shall be deemed so.

[6] A "workover operation" is the work conducted on wells after the initial completion for the purpose of maintaining or restoring the productivity of a well." 30 C.F.R. § 250.601; *see also* Tr. 319 (workover is a general term that refers to numerous operations after a well is drilled, including repairs to a producing well).

wireline services[7] and set a packer in the well. Stip. Fact ¶11; Tr. 14, 37-38, 317. Other contractors were also hired.[8]

On December 5, 2022, TCP's crew arrived at the worksite, which included Supervisor Jason Walker ("Supervisor Walker"),[9] and two wireline operators, Charles "Brian" Walker ("B. Walker") and Tristan McLelland. Tr. 38, 168, 317, 318, 319. The TCP crew met with Sullivan to determine when and where to rig up[10] for the wireline operation. Tr. 66-67. Before rigging up, the TCPs crew met with some of the other contractors and discussed the location of equipment, the well pressure, and the need to stay clear of overhead loads, but did not discuss setting up buffer zones around pressurized equipment or restraining the pressurized pump iron. Tr. 346-47, 348.

The pump tank was originally rigged up to the frac stack with Jaguar's flowback[11] iron or piping. Stip. Fact ¶12. The flowback iron had been restrained or secured until it was removed for some unknown reason the morning of the accident. Stip. Facts ¶12, 13. That morning, Josh

---

[7] "Wireline services include providing maintenance for partially drilled oil and gas wells and gathering 'geophysical data relevant to production.'" *In re Larry Doiron, Inc.*, 869 F.3d 338, 343 (5th Cir. 2017), *on reh'g en banc*, 879 F.3d 568 (5th Cir. 2018) (quoting *Domingue v. Ocean Drilling & Expl. Co.*, 923 F.2d 393, 394 n.3 (5th Cir. 1991)).

[8] Branton Oil Tools provided the packer. Tr. 14. A "packer" "is a device that is inserted into the wellbore and expands to form a sort of seal." Tr. 14. Eastern Energy Services provided the lubricator. Tr. 43, 163. A "lubricator" is a "fabricated length of tubular pipe equipped with a pack-off and bleed valve(s) that is installed to provide access while working on a well under pressure with wireline or other tools and equipment." Ex. C-28, API Recommended Practice 54, §3.1.48 ("API RP 54"). Eastern owned the grease unit, which consisted of pumps and an injection line and a return line. Tr. 54-55. It pumped honey oil or grease through flow tubes, which also had the wireline going through them. Tr. 55. It also controlled and contained wellbore pressure and sealed the top of the lubricator to prevent oil or gas from flying out of its top. Tr. 55. Jaguar Energy Services, LLC is a flowback and well testing company that provided flowlines and provided and operated the frac stack and other equipment at the worksite. Stip. Fact ¶9. Red Diamond was the company that provided the crane at the wellsite. Tr. 346-47. Reliance Well Services, Inc., is an oil and gas contractor that provided a workover rig, pump tank (or "pump skid"), and pipe (or "pump iron") that was used to bleed pressure off the well. Stip. Facts ¶10, 12; Tr. 14.

[9] Supervisor Walker was a wireline engineer.

[10] "Rig up/rig down" is the "on-site erection and connection of equipment and components in preparation for drilling or well servicing operations and the taking apart of equipment for storage and portability prior to moving off the rig floor or location." API RP 54, §2.1.66.

[11] A "flowback operation" is the "process of allowing fluids to flow from the well following a treatment, either in preparation for a subsequent phase of treatment or in preparation for cleanup and returning the well to production." API RP 54, §3.1.48. The term "iron" generally refers to joints of pipe that are connected to the well and through which fluids can be delivered to or removed from the well. Tr. 53-54. At trial, "iron" was colloquially referred to as iron, pump iron, pipe, or line. Tr. 53-54, 144-145, 476.

Terwilleger, a Jaguar employee, borrowed Reliance's pump iron from Scott Edwards to use for a vent line. Tr. 262. Although Reliance had chains at the worksite to restrain the joints on its pump iron, they were not used the day of the accident. Tr. 293-94, 345. Edwards did not inspect the condition of the rigged-up pieces of pump iron, and he was unsure whether his crew or Jaguar inspected them. Tr. 272. He also testified that neither his crew nor Jaguar pressure-tested the pump iron. Tr. 272-73. Edwards did visually check to ensure the choke valves on the manifold were open to the top of the tank and made sure there was no pressure or fumes coming out of the pipe. Tr. 274. TCP's crew was not informed of the decision to use Reliance's pump iron or the purpose for which it was to be used and was not aware of the pump iron's condition or that it had not been pressure tested. Tr. 271-74.

The TCP crew placed their equipment in position, sometimes referred to as "spotting up," and began to rig up and assemble tools for the first run. Tr. 50, 68-69, 173; Ex. C-8 at 1. TCP's crew and Eastern's crew assembled Eastern's lubricator and Eastern ran pressure-rated grease through the lubricator to contain the wellbore pressure to allow TCP to safely[12] lower its tools into the well. Tr. 43-44. The crane hoisted the grease head and lubricator containing the tools up and "stabbed" them onto the well. Tr. 70-72, 173. Supervisor Walker completed the first run in approximately two hours. Tr. 73, 179, 325-26, 329.

At the end of the first run, TCP pulled its tools up into the lubricator, the upper master valve on the frac stack was closed, and pressure was bled off[13] from the equipment above the upper master valve. Tr. 74, 76, 180. Since heavy water had recently been pumped in to reduce the pressure, McLelland and B. Walker did not check the pressure. Tr. 177-79. After Jaguar bled pressure off the lubricator, the crane took it off the tree[14] and TCP's crew laid it down. Tr. 74, 76-77, 144-45, 180, 183, 322-23; Stip. Fact ¶14.

McClelland and B. Walker removed the tools used for the first run and assembled the next tool string containing the packer, placed it inside the lubricator on the ground, and the crane hoisted

---

[12] McLelland testified the well pressure must equal the lubricator pressure before the tools go into the well. Tr. 174.

[13] In the oil and gas industry, to "bleed off" or "bleed down" refers to relieving pressure from a system. Tr. 77-78, 467. During a bleed off, pressure is released from the well through joints of pipe connected from the frac stack to a pump tank and then into the atmosphere. Tr. 77, 312, 467-69.

[14] A "tree" is the "valves and fittings assembled at the top of a completed well to control the flow of hydrocarbons and other fluids." API RP 54, §3.1.80.

it back onto the top of the frac stack. Tr. 80, 135, 183, 321. Before the second run, the well pressure was higher, which was slightly concerning to Supervisor Walker, because he wanted the pressure stable or decreasing. Tr. 81, 330. The group decided that the pressure in the well would be bled off after the packer was set and while TCP was pulling the wireline tools out of the well. Tr. 321. B. Walker and Tristian checked the well pressure at the wellhead approximately every hour during the second run. Tr. 91-92, 185-186. After roughly four hours, Supervisor Walker was able to set the packer and then began spooling the wireline with the wench on the truck. Tr. 82-83, 86, 89, 190; Exs. C-16 at 1, C-20 at 6.

At some point Supervisor Walker and McLelland noticed no one was bleeding down the well despite the plan to do so and Supervisor Walker directed McClelland to check the pressure in the well and inform Sullivan. Upon learning the pressure had increased, Sullivan told Edwards to close the choke manifold on the pump tank, where the pump iron enters the tank (which closes that end of the pipe and contains the pressure in the pump iron) so Edwards could check the pressure in the well on a gauge at the pump tank. Tr. 95-96, 193-194, 199-200, 219; 280-81, 283, 285-86, 302-03, 335; Ex. C-9 at 6, Ex. C-16 at 2. Once Edwards closed the choke manifold, Sullivan told Terwillegar to open a valve on the frac stack at the accumulator. Tr. 281, 558-59.

Opening the valve, however, released the well pressure into the pump iron. Tr. 559. Seconds later, the pump iron ruptured and whipped around violently, throwing one worker as far as 60 feet. Stip. Fact ¶17; Ex. C-16; Tr. 104-06, 107, 300, 324, 623-624, 626; Ex. C-8, Ex. C-10 at 2, Ex. C-12, Ex. R-2 at 2. Edwards was knocked to the ground. Tr. 297-98. B. Walker and two other workers were hospitalized. Stip. Fact ¶18; Tr. 107, 598; Ex. C-12, Ex. C-16 at 2; Ex. C-20 at 6. Sullivan and a Jaguar employee died. Stip. Fact ¶19.

### III. ANALYSIS

The fundamental objective of the Act is to prevent occupational deaths and serious injuries. *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11 (1980). The Act "establishes a comprehensive regulatory scheme designed 'to assure so far as possible safe and healthful working conditions' for 'every working man and woman in the Nation.'" *Martin v. Occupational Safety & Health Rev. Comm'n (CF&I Steel Corp.)*, 499 U.S. 144, 147 (1991) (quoting 29 U.S.C. § 651(b)). Regulatory responsibilities under the Act are divided between the Secretary and the Commission. *See Ibid.* at 151–52 (describing the "unusual regulatory structure established by the Act"). The Secretary exercises rulemaking and enforcement powers, establishes the standards, investigates employers

to discover non-complying conduct, and issues citations and proposed monetary penalties. 29 U.S.C. §§ 655, 657–59. The Commission exercises adjudicative powers and serves as the "neutral arbiter" between OSHA and an employer. *Cuyahoga Valley Ry. v. United Transp. Union*, 474 U.S. 3, 7 (1985) (per curiam).

In the Fifth Circuit where this case arose,[15] "[i]t is well-settled that the Secretary has essentially two weapons in [his] arsenal of enforcement. First, the Secretary may issue a citation for violations of specific standards promulgated (through rulemaking) by the Secretary." *Reich v. Arcadian Corp.*, 110 F.3d 1192, 1196 (5th Cir. 1997). "Alternatively, where the Secretary has not promulgated standards, he may rely on the General Duty Clause as a 'catchall provision.'" *Ibid.* The "focus" of the general duty clause "is on an employer's duty to prevent hazardous conditions from developing in the employment itself or the physical workplace."[16] *Arcadian*, 110 F.3d at 1196.

"To establish a violation of the general duty section, the Secretary must prove '(1) that the employer failed to render its workplace 'free' of a hazard which was (2) 'recognized' and (3) 'causing or likely to cause death or serious physical harm.'" *Getty Oil Co. v. Occupational Safety & Health Rev. Comm'n*, 530 F.2d 1143, 1145 (5th Cir. 1976) (citation omitted). "Moreover, (4) the hazard must be preventable." *Ga. Elec. Co. v. Marshall*, 595 F.2d 309, 321 (5th Cir. 1979). In addition, (5) "'employer knowledge is a required element of a [serious] violation.'" *Byrd Telcom, Inc. v. Occupational Safety & Health Rev. Comm'n*, 657 F. App'x 312, 315 (5th Cir. 2016) (unpublished) (quoting *W.G. Yates & Sons Constr. Co. v. Occupational Safety & Health Rev.*

---

[15] Under the Act, the employer or the Secretary may appeal a final Commission order to the federal court of appeals for the circuit in which the violation allegedly occurred or where the employer has its principal office, and the employer also may appeal to the District of Columbia Circuit. *See* 29 U.S.C. §§ 660(a) and (b). The Commission has held that "[w]here it is highly probable that a case will be appealed to a particular circuit, the Commission generally has applied the precedent of that circuit in deciding the case—even though it may differ from the Commission's precedent." *Kerns Bros. Tree Serv.*, No. 96-1719, 2000 WL 294514, at *4 (OSHRC Mar. 16, 2000). Here, the worksite was in Texas and TCP's principal office was in Louisiana, both in the Fifth Circuit. Therefore, in deciding this case the Court applies Fifth Circuit precedent, where it is highly probable that a case will be appealed to.

[16] Even though TCP did not own or control the worksite, the Court concludes the wellsite was a place of employment for TCP employees. *See Baroid Div. of NL Indus., Inc. v. Occupational Safety & Health Rev. Comm'n*, 660 F.2d 439, 445 (10th Cir. 1981) (concluding worksite a place of employment for cited employer's employees even though cited employer did not control the worksite).

*Comm'n*, 459 F.3d 604, 607 (5th Cir. 2006); *see also Horne Plumbing & Heating Co. v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 564, 568 (5th Cir. 1976)).

### A. Alleged Violation

The Secretary alleges in the complaint and citation, as amended, that TCP violated the general duty clause when its employees "were standing in close proximity to the frac stack and pressured piping during depressurization of the frac stack and when piping ruptured. [TCP] did not ensure all flowlines and relief lines were restrained to prevent whipping or designate a buffer zone." Mot. to Am. Cit. and Compl. at 3. "This condition exposed employees to fire, explosion, and struck-by hazards." *Ibid.* The Secretary asserts among other feasible and acceptable abatement methods to correct the alleged hazards, that TCP could "follow American Petroleum Institute (API) Recommended Practice (RP) 54 . . . section 16.8, which states '[a]ll flowlines and relief lines should be restrained to prevent potential whipping of lines or a designated buffer zone established.'" *Ibid.*

### (1) Hazard Existed

Under the first element, the "term '[hazard],' being left undefined by the statute, carries its ordinary meaning." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009). Thus, the Commission has held its commonly understood meaning is '[s]omething causing danger,' 'peril, risk, or difficulty.'" *Integra Health Mgmt., Inc.*, No. 13-1124, 2019 WL 1142920, at *5 (OSHRC Mar. 4, 2019) (citation omitted). "The context in which the term is used makes clear that in the Act, 'hazard' means a danger/peril/risk arising out of the employee's work—in a broad sense." *Ibid.*

There is no dispute that "TCP Specialists employees were exposed to a stuck-by hazard created by the ruptured Reliance pipe on December 5, 2022." Stip. Fact ¶20. The Secretary argues the hazardous condition was the "[b]leeding off, i.e. depressurizing, a well is an activity or condition that inherently creates or contributes to the risk of fire, explosion, and struck-by hazards." Sec'y's Br. at 19. But TCP argues the hazardous condition was "pressurizing the corroded Reliance piping in preparation to bleed down the well" that began when Brammer and Jaguar "decided to pressurize the Reliance piping." Resp't's Reply Br. at 2 (citing the Secretary's

expert, Paul Luker,[17] at Tr. 519-20, 529, 535-36, Tr. 571). The Court concludes the Secretary has properly defined the hazard.

As the Commission has admonished, "the Act is directed to the conditions of employment which *an employer furnishes to its employees* in terms of their health and safety." *Beverly Enters.*, No. 91-3144, 2000 WL 34012177, at *9) (OSHRC Oct. 27, 2000) (consolidated) (emphasis added). In general duty clause cases, the proximate cause of the accident does not determine the definition of the hazardous condition; "it is the hazard, not the specific incident that resulted in injury or might have resulted in injury," which "is the relevant consideration in determining the existence of a recognized hazard." *Arcadian Corp.*, No. 93-0628, 2004 WL 2218388, at *9 (OSHRC Sept. 30, 2004) (citation omitted).

Thus, the Secretary must define the "hazard in terms of preventable practices or conditions." *Pelron Corp.*, No. 82-388, 1986 WL 53616, at *3 (OSHRC June 2, 1986). This means the "hazard must be defined in a way that apprises the employer of its obligations," and "identifies conditions or practices over which the employer can reasonably be expected to exercise control." *Arcadian*, 2004 WL 2218388, at *7. The Secretary contends he has defined the hazards in a manner that informed TCP of its obligations and identified conditions over which the company can reasonably be expected to exercise control. Sec'y's Br. at 20. The Court agrees with the Secretary.

TCP argues the citation does not identify hazardous or violative conditions over which it could reasonably be expected to exercise control and asserts it only controlled its wireline operations and safety responsibilities related to those operations and had no expertise in other

---

[17] The Secretary tendered Luker "as an expert in the oil and gas industry specifically on workover operations, which would include the type of operations such as wireline and flowback operations and the safety policies and procedures of those operations." Tr. 406. The Court qualified him as an expert in those areas. Tr. 429. To form his opinion, Luker reviewed the citation, safety narratives, violation worksheets, investigation notes, and an OSHA Salt Lake Technical Center report. Ex. C-27 at 1. Luker reviewed employee statements, depositions in civil cases, technical literature, Jaguar's and Brammer's reports, and the well procedures given to Sullivan. Tr. 431-32; Ex. C-27 at 1. He also reviewed photographs and the dashboard video of the incident and read API RP 54. Tr. 433-34; Ex. C-27 at 1. Lastly, he reviewed OSHA's Oil and Gas e-Tool, OSHA Publication 3763, and OSHA's Oil and Gas Rig Inspection Checklist for Drilling & Well Servicing Operations. Ex. C-27 at 1-2. He also relied upon his experience as a well-site supervisor, including over wireline operators, and developing procedures for abatement methods. Tr. 424-25. To develop these procedures, he would plan for the worst-case scenario, which means "we're going to select abatement measures that exceed the potential for a[n] incident based on the type of operations being performed." Tr. 425-25.

hydraulic fracturing work.[18] Resp't's Br. at 21, 22. TCP also argues it lacked control over the pump iron and frac stack and whether they were appropriately pressurized, inspected, and maintained.[19] Resp't's Br. at 21-23. TCP's expert, Jarold Elgin,[20] confirmed TCP had no expertise in other contractors' equipment and, in any event, testified that these contractors would not allow TCP to test their equipment. Tr. 631-32, 662. The Court agrees with TCP that it lacked the above-described control.

Nonetheless, TCP could and did control its employees' proximity to pressurized equipment, which is the hazard. Supervisor Walker directed B. Walker and McLelland to take up positions near the well to read pressure gauges and ensure no one closed the master valve on the wireline. Tr. 340-45, 365-66; Ex. C-16 at 2. Therefore, their proximity to the frac stack and pressurized pump iron is the preventable condition TCP could and did control.

The hazard must also be defined "in terms of the physical agents that could injure employees rather than the means of abatement." *Mo. Basin Well Serv., Inc.*, No. 13-1817, 2018 WL 1309482, at *2 (OSHRC Mar. 1, 2018). TCP argues the Secretary "improperly defined the hazardous 'condition' as the absence of abatement methods OSHA recommends."[21] Resp't's Br. at 18-19. The Court does not agree. As the Secretary explains, the sentence in the citation that states that "TCP employees were standing in close proximity to certain equipment during depressurization operations describes the *condition* that contributed to an increased risk of fire, explosion, and struck-by hazards to its employees." Sec'y's Br. at 20 (emphasis in original). "A

---

[18] TCP also argues it was not expected to participate in the risk assessment for bleeding pressure off the well, during which the use of restraints and a buffer zone would have been discussed, or to pressure test the pump iron. Resp't's Br. at 23-24. Because the other contractors safely performed the bleed down after the first run and had both the expertise and responsibility to control pressure-related hazards, TCP asserts it could not reasonably be expected to exercise control over these tasks. Resp't's Br. at 24-25.

[19] B. Walker, McLelland, and Supervisor Walker all testified they did not have authority, expertise, or a role in pressure testing pump iron, inspecting pump iron, or bleeding off pressurized equipment. Tr. 145-46, 222, 371-74.

[20] TCP proffered Elgin as an expert in the fields of workover operations and petroleum engineering. Tr. 622-23. The Court qualified him as an expert in those areas. Tr. 623. To form his opinion, Elgin reviewed among other things, API RP 54, the citation, OSHA's investigative narrative and violation worksheet, and Luker's report. Ex. R-4 at 7. He also reviewed documents in the exhibits, the video of the incident, and listened to testimony. Tr. 621.

[21] TCP again argues the actual hazardous condition was Jaguar's pressurization of Reliance's corroded pump iron. Resp't's Br. at 18-19. And again, the Court finds no merit in this argument since the hazardous condition was *not* Jaguar's pressurization of Reliance's corroded pump iron.

buffer zone, on the other hand, is an area that employees are instructed not to enter to protect them from these hazards, which is the opposite of the condition described in the Citation." *Ibid.* The Court agrees with the Secretary.

Although the increased hazard posed by the proximity of employees to pressurized equipment and the proposed abatement measure of establishing a buffer zone appear to overlap to the extent that they both address employees standing near pressurized equipment, that overlap is not fatal to the Secretary's case. In *Missouri Basin*, the Commission held that although "the alleged hazard and the Secretary's main proposed abatement method overlap to some extent," the "hazard allegation itself does not specify an abatement method[.]" *Mo. Basin*, 2018 WL 1309482, at *2.

Here, standing near pressurized equipment is distinct and separate from a buffer zone and line restraints. Stated another way, standing near pressurized equipment is a practice that increases the likelihood of the alleged hazard, whereas a buffer zone and line restraints are the methods meant to decrease the likelihood of that hazard. *See Well Sols., Inc., Rig No. 30*, No. 91-340, 1995 WL 242595, at *2 (OSHRC Apr. 19, 1995) (alleged hazard consisted of practices that increased likelihood of a hazard); *Pelron*, 1986 WL 53616, at *4 (hazard defined "as practices, procedures or conditions which *increase* the likelihood of an explosion").

TCP also argues that "working around *any* pressurized equipment without line restraints or a buffer zone" is not a hazardous condition. Resp't's Br. at 26, 29; Resp't's Reply Br. at 7 (emphasis in original) (citing *Nat'l Realty & Constr. Co. v. Occupational Safety & Health Rev. Comm'n*, 489 F.2d 1257, 1266 (D.C. Cir. 1973); *Pelron*, 1986 WL 53616, at *2. TCP also asserts that working around pressurized equipment "is a normal activity in the oil and gas industry" and argues that "[w]orking around pressurized equipment . . . does not, in and of itself, create or contribute to an *increased risk* of serious injury to" its employees. Resp't's Br. at 26, 28, 29) (emphasis in original). This is because, according to TCP, "the vague reference to 'pressurized equipment' does not define the specific physical agents that may cause injury," which "is required to prove a general duty clause violation." Resp't's Br. at 29. The Court does not agree.

Normal and inherently dangerous activities can constitute hazards where an employer can prevent or reduce the likelihood of danger to employees. *See SeaWorld of Fla. v. Perez*, 748 F.3d 1202, 1210-11 (D.C. Cir. 2014) (nature of workplace and the unusual nature of the hazard did not remove employer's obligation under the general duty clause to protect its employees from recognized hazard). In *Pelron*, the decision cited by TCP, the Commission observed that "some

industrial activities are by their very nature dangerous. To permit the normal activities in such an industry to be defined as a 'recognized hazard' within the meaning of section 5(a)(1) is to eliminate an element of the Secretary's burden of proof . . . ." *Pelron*, 1986 WL 53616, at *3. However, in *SeaWorld*, the D.C. Circuit distinguished *Pelron* and noted that the hazard posed may not be "'so idiosyncratic and implausible' that it cannot be considered preventable." *SeaWorld*, 748 F.3d at 1210 (quoting *Nat'l Realty*, 489 F.2d at 1266). Nothing "in *Pelron* immunizes a workplace's dangerous 'normal activities' from oversight; the Commission simply applied well-established law that only 'preventable' hazards can be considered as recognized." *Id.* at 1211.

The hazardous condition here was TCP's employees standing in close proximity to the frac stack and pressured piping during depressurization of the frac stack, which exposed them to fire, explosion, and struck-by hazards. And since TCP controls its employees' access or proximity to the pressurized equipment, the hazard is not "so idiosyncratic and implausible that it cannot be considered preventable" within the meaning of § 5(a)(1). *Id.* at 1210.

### (2) Recognized Hazard

Under the second element, "a recognized hazard is a condition that is known to be hazardous and can be established by proving that the employer had actual knowledge that a condition is hazardous or by proving that the condition is generally known to be hazardous in the industry." *Acme Energy Servs. v. Occupational Safety & Health Rev. Comm'n*, 542 F. App'x 356, 363 (5th Cir. 2013) (internal quotations omitted) (citation omitted).[22] "Thus, whether or not a hazard is 'recognized' is a matter of objective determination. It does not depend upon whether the particular employer appreciated that the [hazardous condition] was a recognized hazard in industry." *Ga. Elec.*, 595 F.2d at 321 (citation omitted).

The Commission has held that "a supervisor's knowledge of hazardous conditions is imputable to his employer," *Caterpillar, Inc.*, No. 93-373, 1996 WL 506643, at *1 (OSHRC Sept. 4, 1996), "and from this knowledge it imputed to the Company recognition of the hazard." *Ga. Elec.*, 595 F.2d at 321. Based on Supervisor Walker's testimony, it is clear he recognized the hazards. He was TCP's supervisor at the wellsite and he was aware of the hazards associated with

---

[22] According to TCP, the Secretary presented no evidence that anyone from TCP had actual knowledge the pump iron was corroded, and that this condition was not visible from the outside. Resp't's Br. at 29-30 (citing Tr. 149, 534). The Court declines to address this argument since it is in conflict with the hazard as defined by the Secretary and found by the Court *supra*.

bleeding off the well, such as pump iron exploding, rupturing, and whipping around. Tr. 132, 217, 318, 324. He also testified employees could protect themselves by not standing "right next to the iron where your [sic] bleeding down" or staying away from pressurized equipment. Tr. 325. Both experts testified that the hazards existed once the pump iron was pressurized and that all the contractors at the wellsite would have recognized pressure-related hazards caused by bleeding down the well. (Tr. 472, 571, 662). The Court concludes Supervisor Walker had actual knowledge of the hazardous condition, which is imputed to TCP, and because of this knowledge, recognition of the hazard is imputed to TCP.[23]

### (3) Hazard Caused or Was
### Likely to Cause Death or Serious Physical Harm

Under the third element, the Secretary must establish the hazard at the worksite was "causing or likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1).[24] The Secretary satisfies the "likely to cause" element "by proving that the practice at issue could cause serious physical harm other than as a result of a 'freakish or utterly implausible concurrence of circumstances.'" *Kelly Springfield Tire Co. v. Donovan*, 729 F.2d 317, 325 (5th Cir. 1984) (quoting *Nat'l Realty*, 489 F.3d at 1265 n.33). "The Secretary is not required 'to show that an accident is likely but rather that *if* an accident were to occur, death or serious physical harm would be the likely result.'" *A.H. Sturgill Roofing, Inc.*, No. 13-0244, 2019 WL 1099857, at *2 (OSRHC Feb. 28, 2019) (quoting *Beverly*, 2000 WL 34012177, at *31) (emphasis in original). And worker deaths strongly suggest that the alleged hazards are likely to cause death or serious physical harm. *See Nat'l Realty*, 489 F.2d at 1265 n.33 ("the potential for injury is indicated on the record by Smith's death and, of course, by common sense.").

---

[23] Based upon expert testimony and American Petroleum Institute Recommended Practice 54, the Secretary also claims the oil and gas industry recognized the alleged hazard of employees standing in close proximity to the frac stack and pressurized pump iron increased the likelihood of their exposure to fire, explosion, and struck-by hazards. Having determined that TCP recognized the hazard, the Court does not address this argument.

[24] Under the Act, a "serious violation" exists in a place of employment "if there is a substantial probability that death or serious physical harm could result from a condition which exists . . . unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(k). "The gravamen of a serious violation is the presence of a 'substantial probability' that a particular violation could result in death or serious physical harm." *Chao v. Occupational Safety & Health Rev. Comm'n*, 401 F.3d 355, 367 (5th Cir. 2005) (citation omitted). The "substantial probability" requirement "is key in an analysis of whether a violation is serious." *Byrd*, 657 F. App'x at 315.

Here, the injuries and deaths resulting from the accident demonstrate that if an accident were to occur with employees standing near pressurized equipment, death or serious physical harm was the likely result. *See Nat'l Realty*, 489 F.2d at 1265 n.33 (finding "potential for injury" based upon employee's death). The potential for injury is indicated here by the death of two workers and the injury of three others. Therefore, the Secretary has established there was a substantial probability that the hazard caused or was likely to cause death or serious physical harm.[25]

### (4) Hazard was Preventable

The Secretary bears the "burden to show that demonstrably feasible measures would materially reduce the likelihood that such injury as that which resulted from the cited hazard would have occurred." *Champlin Petroleum Co. v. Occupational Safety & Health Rev. Comm'n*, 593 F.2d 637, 640 (5th Cir. 1979). "The Secretary must specify the particular steps the employer should have taken to avoid" the citation and "must demonstrate the feasibility and likely utility of those measures." *Ibid.* Further, the general duty clause "requires the employer to eliminate only 'feasibly preventable' hazards." *Ibid.* (quoting *Getty Oil*, 530 F.2d at 1145). As such, "employers may choose any effective method to abate a recognized hazard under the general duty clause." *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 615 (5th Cir. 2021).

The parties dispute the applicability of API RP 54 to the conditions at the worksite. However, the Court does not need to resolve that dispute. While API RP 54 may be probative evidence of industry recognition of the alleged hazard, the Secretary is not required to show "the employer's industry has recognized the proposed [abatement] measure." *Sci. Applications Int'l Corp.*, No. 14-1668, 2020 WL 1941193, at \*10 (OSHRC Apr. 16, 2020) (citing *Chevron Oil Co., Cal. Co. Div.*, No. 10799, 1983 WL 23864, at \*2 (OSHRC Apr. 20, 1983)). Rather than proving the API RP 54 establishes recognition of the abatement measures, the citation uses it as an example

---

[25] TCP argues "the unforeseeable valve-sequencing mistake that caused the corroded Reliance piping to rupture happened so quickly that it did not allow time for the TCP employees to back away from the well once the bleed off procedure was initiated." Resp't's Br. at 37 (citing Tr. 559-60). Thus, TCP asserts that because the pump iron ruptured so quickly, Supervisor Walker could not have known or corrected "the hazardous condition created by Jaguar improperly pressurizing the corroded Reliance" pump iron. *Id.* at 37. The Court is not persuaded. The actual rupture may have happened quickly, but TCP knew the equipment would be pressurized, knew the alleged hazard posed by employees standing near pressurized equipment, and knew its employees would be standing near pressurized equipment. Supervisor Walker orchestrated the positions of B. Walker and McLelland. Therefore, the Court concludes that, with the exercise of reasonable diligence, TCP could have, and in fact did know, of the presence of the violation.

of feasible and acceptable abatement methods, as evidenced by the "among other methods" language. The Secretary asserts several sections of the API RP 54 support his proposed abatement measures, including section 7.11.3 that TCP appears to agree, is the operative section in API RP 54, which provides that a "buffer zone based on the risk assessment is recommended to limit injury exposure." API RP 54, §7.11.3.

The Fifth Circuit has recognized the particular abatement method set forth in an industry standard, not the standard's applicability to the work being performed, controls in a feasibility determination. *See Acme*, 542 F. App'x at 367 ("regardless of whether the [API RP] was intended to apply only to servicing rigs, the Secretary only needs to show the method is feasible or 'capable of being done'") (quoting *Beverly*, 2000 WL 34012177, at *34).

### 1. Feasibility

The Secretary contends the oil and gas industry recognizes restraining pump iron prevents line whip, which can occur after a pipe ruptures and releases pressure. Sec'y's Br. at 35 (citing Tr. 478-79). The line restraint method, according to the Secretary, was feasible and available. The Court does not agree. Although TCP's employees testified nearly half of worksites used it, and the Jaguar flowline had been restrained earlier on the day of the accident, *Ibid.* (citing Tr. 126, 364; Ex. C-21 at 13), the Secretary must also demonstrate "that the measures are capable of being put into effect[.]" *Beverly*, 2000 WL 34012177, at *34) (citing *Nat'l Realty*, 489 F.2d at 1267). The Secretary asks the Court to adopt an expansive reading of "capable" to encompass abatement measures within the control of *other* employers and involving *their* equipment. Sec'y's Br. at 38. The Court declines to do so.

Asking for line restraints is different from using line restraints to abate the likelihood of the alleged hazard. This distinction reaches the core of the general duty clause, which "requires employers to discover and exclude from the workplace '(a)ll (feasibly) *preventable* forms and instances of hazardous conduct.'" *Getty Oil*, 530 F.2d at 1145 (citation omitted) (emphasis added by *Getty*). "[T]he very word duty implies an obligation capable of achievement." *Nat'l Realty*, 489 F.2d at 1266 n. 35 (citation omitted). Therefore, the measures capable of being put into effect must be within TCP's control.

Although the line restraints method was generally capable of being put into effect, TCP was not capable of doing so. TCP employees had no direct role in bleeding down the well such that they could control the line restraints. Tr. 145, 222, 339-40. And wireline operators were not

normally informed whether pump iron had been pressure tested and were not positioned to determine whether line restraints were necessary. Tr. 273-74, 296. Elgin confirmed TCP had no expertise in other contractors' equipment and, in any event, those contractors would not allow TCP to test their equipment. Tr. 631-32, 662.

The Court concludes TCP lacked control over the line restraints. Because the line restraints were owned and controlled by Reliance, TCP could merely suggest their use, not unilaterally utilize them. This renders infeasible the Secretary's proposed line restraints method to abate the increased likelihood of a hazard posed by standing near pressurized equipment. *See Baroid*, 660 F.2d at 447 (the Act requires the employer to "abate recognized hazards as to which the Secretary has met his burden to show that a feasible method exists by which the *cited employer* could have abated the hazard") (emphasis added).

Nonetheless, TCP still owed a duty to its employees to abate the hazards. And the Court concludes TCP could have established the Secretary's second proposed abatement, a buffer zone around the pressurized equipment. Luker opined that a separate risk assessment could have been performed by any contractor whose employees could have been exposed to a potential, known hazard, and "TCP should have done their risk assessment for that buffer zone based on the fact that they're on location with their employees." Tr. 546, 547. Luker testified that TCP employees "were aware of buffer zones and they . . . do their own risk assessment for buffer zones and they clearly talked about not standing near high pressure lines." Tr. 578. Luker also testified that a reasonably prudent employer would have established a designated buffer zone. Tr. 499, 573; *see also* Ex. C-27 at 5. The Court credits Luker's expert opinion, and concludes TCP was capable of providing and enforcing a buffer zone for its employees, which was a feasible method of abating exposure to the alleged hazards posed by standing near pressurized equipment.

## 2. Efficacy

The Secretary "is not required to show the abatement would completely eliminate the hazard." *Acme*, 542 F. App'x at 365 (citing *Morrison-Knudsen Co.*, No. 88-572, 1993 WL 127946, at *19 (OSHRC Apr. 20, 1993)). "To assess the efficacy of a proposed abatement measure," the Court "first consider[s] the adequacy of the employer's existing safety procedures." *Sci. Applications*, 2020 WL 1941193, at *8 (citing *U.S. Postal Serv.*, No. 04-0316, 2006 WL 6463045, at *6-7 (OSHRC Nov. 20, 2006)).

TCP contends it reasonably relied upon the expertise of the other contractors to use methods to eliminate the incidence of the hazard posed by the corroded piping. Resp't's Br. at 38-39. Those companies, according to TCP, were positioned to pressure test Reliance's pump iron "and/or [to] follow[] the safe and effective valve-sequencing procedure," which are "superior abatement methods to merely attempting to mitigate exposure to the hazard by using line restraints or a buffer zone." Resp't's Br. at 39. The Court does not agree.

"Reasonable reliance" is an affirmative defense to an employer's constructive knowledge and not properly analyzed under the abatement element of the Secretary's case. *See Manua's, Inc.*, No. 18-1059, 2018 WL 6171790, at *3-4 (OSHRC Sept. 28, 2018) ("Reasonable reliance on a specialty contractor . . . is an affirmative defense to constructive knowledge, and therefore Respondent had the burden of proof."), *aff'd*, 948 F.3d 401 (D.C. Cir. 2020). Further, the Court concludes that just as the Secretary cannot establish the feasibility of line restraints since TCP is incapable of putting it into effect, TCP cannot offload responsibility for its employees' safety on other employers by arguing those employers controlled superior abatement methods. The Act is explicit; each employer must "*furnish to each of his employees* employment and a place of employment which are free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1) (emphasis added).

Although TCP had an informal work "rule" to stay away from pressurized equipment, its employees "testified that they were not aware of any work rules or policies about . . . designating an established buffer zone around pressurized equipment when the well is being bled off." Sec'y's Br. at 32-33 (citing Tr. 128, 209, 349). And employees "could not explain how far away they" needed to be from pressurized equipment or when it was necessary to do so, and they did not discuss doing so on the day of the accident or execute it, according to the Secretary. *Id.* at 33 (citing Tr. 123-24, 208, 231, 348, 509; Exs. C-12, C-16). McLelland testified he did "not know of [any TCP policies or procedures for staying away from pressurized pipes] other than just kind of like the verbal about don't be directly on top of it." Tr. 231, 209. Similarly, Supervisor Walker and B. Walker testified TCP did not have any work rules or policies for establishing a buffer zone around pressurized equipment. Tr. 128, 349. And TCP's standard operating procedures confirm the

company had no written rules for working around pressurized equipment or establishing buffer zones.[26] Ex. C-15.

Therefore, the Court concludes the Secretary has established that TCP did not have rules or an alternative abatement method in place, much less a superior abatement method. *Cf. Mo. Basin*, 2018 WL 1309482, at *5 (vacating citation and affirming judge's ruling that employer "had already instituted a number of safety precautions to address the risk of a fire or explosion at the worksite and the Secretary failed to establish that these measures were inadequate").

Turning to whether the Secretary established that his proposed abatement measure would materially reduce the hazard, he contends, based upon Luker's testimony and the fact that Reliance's employees who were standing over 100 feet away were not injured, that a designated buffer zone of approximately 100 feet for non-essential personnel would have materially reduced the hazards for TCP's employees at the wellsite. Sec'y's Br. at 38-39 (citing API RP 54, § 16.8; Tr. 476, 499-501, 502, 509, 514). Although Elgin disagreed that TCP should have established a buffer zone, he acknowledged they were often used around pressure-related hazards and that they would likely reduce a struck-by hazard. *Id.* (citing Tr. 645-46, 667).

TCP argues the Secretary failed to show the establishment of a 100-foot buffer zone would have protected its employees from ruptured pipe fragments because fragments "were found well beyond the 100-foot buffer zone that the Secretary's expert claim[ed]" was required. Resp't's Reply Br. at 16, 21 (citing Tr. 645-46). Even if it is less likely an employee would be struck standing farther away from the wellhead, TCP argues neither the Secretary nor Luker cited any technical guidance to establish the distance required for an effective buffer zone. *Id.* at 22. TCP argues that to determine whether a buffer zone would be useful, it requires a risk assessment to

---

[26] Although employers need not have written safety rules, they must be clearly and effectively communicated. *See GEM Indus, Inc.*, No. 93-1122, 1996 WL 710982, at *2 n.5 (OSHRC Dec. 6, 1996), *aff'd*, 149 F.3d 1183 (6th Cir. 1998). Here, even if the Court could find TCP had a verbal work rule to stay clear of pressurized equipment, there is no evidence TCP clearly and effectively communicated it either through trainings or on the day of the incident, or that it was enforced in any manner. *See Capform, Inc.*, No. 91-1613, 1994 WL 530815, at *4 (OSHRC Sept. 29, 1994) (rejecting unpreventable employee misconduct defense and affirming violation where employer failed to show it had a sufficiently communicated and enforced work rule). And even if the Court were to find TCP had safety measures or gave adequate instructions to its employees to address the alleged hazards, the company did not implement them. *See Nelson Tree Servs., Inc. v. Occupational Safety & Health Rev. Comm'n*, 60 F.3d 1207,1211 (6th Cir. 1995) (finding although employer incorporated industry safety standard into its own safety manual, it failed to abate the hazard where that standard was neither followed nor enforced).

determine the size of a buffer zone, which requires calculations. *Id.* at 22 (citing Tr. 546-48). The Court does not agree.

As the Commission has recognized, whether increasing the spacing between the pressurized equipment and employees to 100 feet materially reduces the chances of an alleged struck-by hazard from occurring "is a technical/scientific question that requires expertise to answer." *Mo Basin*, 2018 WL 1309482, at *6 (rejecting Secretary's proposed abatement measures where a non-expert testified to their efficacy and the API standard did not address the circumstances at issue). Here, the Secretary relies on API RP 54, section 16.8 *and* Luker's expertise to formulate this answer. At the outset, because section 16.8 does not expressly contain a 100-foot buffer zone requirement, this section standing alone cannot support the efficacy of the proposed 100-foot buffer zone.[27] API RP 54, §16.8; Tr. 548. Therefore, the Court turns to Luker's expert testimony and other record evidence to answer this question.

Luker opined that due to "potential high severity of line failures, additional measures have been developed to further reduce the risk of injury by establishing a 'buffer zone' or an exclusion area for safe distancing of workers from high pressure lines while they are pressurized," but his report did not directly establish the efficacy of a 100-foot buffer zone. Ex. C-27 at 5. And he did not perform any technical calculations or analysis on the effectiveness of a buffer zone. Tr. 424-25. Nonetheless, Luker opined a 100-foot buffer zone would have materially reduced the alleged hazard to TCP employees. Tr. 476, 513-14, 572. Luker testified that even though blast fragments were found farther than 100-feet from the wellhead, "distance away from the initial failure is our friend," and "[t]he further [sic] back we are from it the less likely we are to suffer impact and even if we do have an impact . . . the severity of the impact will be greatly reduced." Tr. 572. Luker also testified that employees of other contractors at the wellsite at the time of the accident standing outside the proposed abatement zone were not injured. Tr. 514. According to Luker, reaching an exact distance requires several calculations, which are difficult to perform in the field. Tr. 547. Thus, the industry "set some arbitrary number that we know will provide a safe zone," and when the work is completed, those employees excluded from the zone can safely re-enter it. Tr. 547, 549. Luker testified that although the 100-foot buffer zone is not in API RP 54, section 16.8, "it is

---

[27] A 100-foot buffer zone is mentioned in section 5.3.5.2, but as the Commission notes, that standard "does not appear to have been intended to address the circumstances at issue here." *Mo. Basin*, 2018 WL 1309482, at *6.

in other industry standards and based on my experience I put that number in my report because it's easily discovered if you go out and do it, and we use that number in our training." Tr. 508, 548. Luker also testified "[w]e use it in our risk assessments routinely" in the field. Tr. 548. In Luker's expert opinion, buffer zones are always required when employees work around pressurized equipment. Tr. 550.

TCP's expert, Elgin, also opined that standing farther than 100-feet away would reduce the likelihood of harm. Tr. 667. However, he also opined that pressurized pump iron does not always require a 100-foot buffer zone around it. Tr. 640. Further, although he had seen such a buffer zone during testing, he had not seen one during normal operations because the pump iron had already been tested. Tr. 640-41, 664. Elgin also testified that, in his experience, wireline operators did not have restrictions on where they could go on the wellsite during their operations. Tr. 641. In Elgin's experience, a wellsite supervisor would not enforce a 100-foot buffer zone around pump iron while pressure is bled off the well. Tr. 659. According to Elgin, to determine the need for a buffer zone, Sullivan should have conducted a risk assessment to understand "[w]hat could go wrong, assuming worst possible scenario." Tr. 659. Elgin testified that Sullivan would have considered in such an assessment "not just the wireline equipment, not just the pump equipment, but the whole gamut of equipment that's on location to understand what could happen and to make sure that proper precautions are exercised." Tr. 659. Although Elgin testified he had not seen a buffer zone during normal operations, this statement was qualified by the fact the pump iron would have already been tested. Furthermore, although Elgin testified that wireline operators did not have restrictions on where they could work, and supervisors would not enforce such a requirement, he did not object to the basic premise that a buffer zone would reduce the likelihood of the alleged hazards or that they were used during pressure testing.

Thus, both experts agree a 100-foot buffer zone would reduce the likelihood of the alleged hazards, thereby establishing its efficacy. *Cf. Mo. Basin*, 2018 WL 1309482, at \*6 (vacating general duty clause citation where Secretary proffered no expert to opine on distance that would materially reduce chances of a hazard and employer's expert denied distance would substantially reduce hazard). However, relying on *Missouri Basin*, TCP argues the Secretary failed to prove the 100-foot buffer zone would materially reduce the hazard because Luker did not base his opinion on any calculations or technical guidance. This argument misstates the Commission's reasons for vacating the citation in that case. It is true that the Commission rejected the Secretary's abatement

measure that "maintaining a 100-foot distance between the tank and the pump would materially reduce the likelihood of a vapor cloud migrating to the pump." *Ibid.* But that case is distinguishable because there, the Secretary relied on testimony from a compliance officer who was not proffered as an expert, rather than "an expert with the qualifications necessary to opine on this question under Federal Rule of Evidence 702," and "his opinion was given no weight."[28] *Ibid.* And the Commission also rejected the proposed abatement measure because the Secretary misstated the employer's expert's testimony to support the abatement measure. *Ibid.* Here, the Secretary does not misstate Elgin's testimony.

The Court accepted Luker as an expert witness and his lack of calculations and technical studies supporting the efficacy of the 100-foot buffer zone is not fatal since an expert may testify in the form of an opinion if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702(a). Luker oversaw hundreds of projects as a company man or wellsite supervisor, including over wireline operations, and testified the proposed 100-foot buffer zone was the result of his industry experience creating and implementing buffer zones around pressurized equipment. Tr. 401, 423, 508. At the time of trial, he was an independent contractor working as a site safety representative for Energy Transfer, which involved "oversee[ing] the contractors and their activities to ensure that they have proper safety programs and that they're using those effectively" during, among other tasks, workovers, and bleeding off wells. Tr. 392-95. Therefore, his specialized knowledge helps the Court to understand the evidence and determine facts in issue.

The Court also rejects TCP's argument that a 100-foot buffer zone would not materially reduce the incidence of the line rupture hazard because pump iron fragments were found beyond that distance. The Fifth Circuit has found that although the position of an employee "may not eliminate *every* struck-by hazard . . . any adverse effects were minor compared to the safety benefits" of the proposed abatement measure. *Acme*, 542 F. App'x at 366 (emphasis in original). That reasoning holds here. Supervisor Walker and others recognized the alleged hazard, and both Luker's testimony and "common-sense" support the notion that being farther away from pressurized equipment that could fail is safer. *Ibid.*

---

[28] In *Missouri Basin*, the Commission also rejected the proposed abatement measure because the Secretary misstated the employer's expert's testimony to support the abatement measure. *Ibid.* Here, the Secretary does not misstate Elgin's testimony.

TCP also contends the 100-foot buffer zone would be impossible based upon the job's requirements and companies involved, and therefore it is "arbitrary and speculative." Resp't's Reply Br. at 22 (citing Tr. 640-41). TCP argues its employees were performing essential tasks, such as monitoring pressure at the wellhead and ensuring no one closed the master valve on the wireline. *Id.* at 22-23. Their work, according to TCP, required them to stand close to the wellhead. *Ibid.* The Court does not agree.

Luker opined that "[a] buffer zone does not exclude people who are absolutely necessary to be in that area while this work is being performed," but neither B. Walker nor McClelland were performing essential work "at the time that this line was being pressured up." Tr. 509. "[A]t the time that they actually opened the well . . . there was no reason for anybody to be within that buffer zone" because Edwards was going to read the pressure "at the pump panel behind the blast plate, so there was no reason for anybody to be within that zone while they pressured" the pump iron. Tr. 510. Luker opined that only two people were essential at this moment, Edwards, who was reading the pressure on the well from the pump skid panel, and the Jaguar hand, who was operating the actuator panel. Tr. 512. And Sullivan, B. Walker, McLelland, and others could have met behind the pump skid. Tr. 512.

While Luker agreed one employee needed to watch the pressure as the other contractors bled down the well, he opined that because the other contractors had not begun bleeding down the well yet, TCP did not need to monitor the pressure since the other contractors were going to bleed down "after they got shut-in pressure on the well" when all the valves are closed. Tr. 512, 513. And both B. Walker and McLelland had completed their tasks at the time of the accident. Tr. 560-61.

McLelland's and Supervisor Walker's testimony also establishes McLelland was not directly involved in the work being performed at the wellhead at the time of accident. Although Supervisor Walker testified, he did "not necessarily" expect McLelland to come back to the cab or pickup truck after McLelland informed Sullivan the well had not been bled down, he also testified he did not expect McLelland to do anything else. Tr. 337, 340. Further, Supervisor Walker "did not recall" telling McLelland he needed to continuously monitor the pressure after McLelland informed Sullivan the well had not been bled off. Tr. 340.

McLelland's testimony also establishes he was not directly involved in the work being performed at the time of the accident. McLelland testified he told Sullivan that the other contractors

had not begun to bleed down the well and that both he and Sullivan checked the pressure to confirm. Tr. 193, 196. McLelland knew the plan was to bleed off the well once the packer was set and after he spoke to Sullivan. Tr. 189-90, 193. McLelland testified he was watching the gauge to let Supervisor Walker know, "just in case nobody else did." Tr. 200. And TCP employees confirmed they had no direct role in bleeding down the well, which was about to commence. Tr. 145, 222, 339-40.

The Court also rejects TCP's argument McLelland needed to be positioned at the wellhead to safely ensure the removal of the wireline tools. McLelland and Supervisor Walker testified they never had any safety issues with the practice of bleeding down the well with the wireline still inside. Tr. 225, 374. McLelland also testified that TCP was not concerned about pressure blowing the tools out of the well after Supervisor Walker set the packer. Tr. 210, 212. According to McLelland, the purpose of checking the well's pressure was to make sure the packer was set, but increasing pressure was "not really a concern" and "just a kind of like information." Tr. 192. This testimony contradicts TCP's argument that McLelland needed to be near pressurized equipment to mitigate the purported struck-by hazard of the wireline being ejected from the well. Further, "any adverse effects [of not monitoring the pressure would be] minor compared to the safety benefits" of McLelland adhering to a buffer zone under these circumstances. *Acme*, 542 F. App'x at 366 n.38 (citing *Chevron*, 1983 WL 23864, at *5) (finding that "[t]he benefit afforded by the use of flotation devices greatly outweighs the harm that could be caused").

B. Walker was also not directly involved in the work being performed at the time of the accident and he admitted his task was to tell Sullivan that TCP's tools were still in the well and not bumped up. Tr. 99, 101. Once B. Walker conveyed this information, Sullivan knew TCP had not bumped up the tools and, as the company man, Sullivan had the authority to stop any of the other contractors, including Jaguar, from closing a master valve on the wireline. Tr. 133, 161, 261, 310-11. Supervisor Walker also testified that he expected B. Walker to inform Sullivan that the tools were in the well. Tr. 338. Beyond that, he offered B. Walker no specific instructions or tasks to complete at the well head; he only expected B. Walker to take other actions "if there was something he needed to do." Tr. 338. Since neither B. Walker nor TCP had a role in bleeding off

the well, which was about to begin,[29] the Court concludes the proposed buffer zone abatement method was feasible.

### (5) Knowledge

As indicted *supra*, "employer knowledge is a required element of a [serious] violation." *Byrd*, 657 F. App'x at 315. The Commission has held that employer knowledge "is established by a showing of employer awareness of the physical conditions constituting the violation." *Phoenix Roofing, Inc.*, No. 90-2148, 1995 WL 82313, at *3 (OSHRC Feb. 24, 1995). In *Phoenix*, the Commission held the company had actual knowledge of the violative conditions through a supervisor because the supervisor "knew that Phoenix employees worked in proximity to unguarded skylights while positioning and storing materials." *Phoenix Roofing, Inc.*, No. 90-2148, 1995 WL 82313, at *4 (OSHRC Feb. 24, 1995).

Here, TCP does not dispute that Supervisor Walker knew McLelland, and B. Walker were standing near pressurized equipment because he directed them to do so, and Supervisor Walker directed McLelland and B. Walker to work near the pressurized equipment, and he told McLelland to check the well pressure and inform Sullivan the well had not been bled off. Tr. 334-36, 365-67. Because Supervisor Walker was part of a group that decided to bleed down the well while the wireline tools were still in the well, he knew the well was pressurized and the pump iron was about to be pressurized at the time he gave McLelland and B. Walker these instructions. Tr. 320; Ex. C-16.

TCP asserts that the Secretary failed to prove TCP knew or should have known that Reliance's pump iron would be pressurized and that it had not been pressure tested. Resp't's Reply Br. at 8. And TCP argues its crew was not aware that Sullivan told Edwards to close the choke valve, which pressurized the pump iron. *Id.* at 8-9. The Court disagrees. As the Secretary notes, TCP should have known of the violative conditions because it "knew that bleeding off a well is inherently dangerous and creates or contributes to fire, explosion, and struck-by hazards." Sec'y's Br. at 26 (citing Tr. 122, 207, 324). And as the Commission has recognized, "a subcontractor cannot be permitted to close its eyes to hazards to which its employees are exposed, or to ignore

---

[29] The Secretary does not argue that Supervisor Walker was standing near pressurized equipment when the pump iron ruptured. *See* Sec'y's Br. at 40-41. Further, the Court does not need to address this issue to reach its ruling. Therefore, it does not consider Supervisor Walker's position at the wellsite when the incident occurred.

hazards of which it has actual knowledge." *Grossman Steel & Aluminum Corp.*, No. 12775, 1976 WL 5968, at *4 (OSHRC May 12, 1976). Therefore, TCP had actual knowledge of the physical conditions constituting the violation.[30]

## B. TCP's Affirmative Defense

Even though the Court has already found TCP had actual knowledge of the violative conditions, it briefly considers TCP's affirmative defense. TCP asserts, as a defense to constructive knowledge, that it "reasonably relied on the expertise of the specialists, Brammer, Jaguar and Reliance, to ensure the Reliance piping was in a good operating condition." Resp't's Br. at 30 (citing *Sasser Elec. & Mfg. Co.*, No. 82-178, 1984 WL 34886, at *4 (OSHRC July 20, 1984), *aff'd*, No. 84-1961, 1985 WL 1270163 (4th Cir. Aug. 8, 1985) (unpublished); *Martin Constr., Inc.*, No. 06-0700, 2007 WL 4963590, at *7 (OSHRC March 5, 2007)). Specifically, TCP contends Reliance, as the owner of the corroded pump iron, should have known of its condition. Resp't's Br. at 31. Jaguar, as the company installing the pump iron, should have pressure tested it and followed procedures to safely bleed it down. *Ibid.* Brammer, as the controlling employer, made the decision to use the Reliance pump iron and pressurized the Reliance pump iron. *Ibid.* Therefore, TCP argues, it had no reason, by way of expertise, control, or time, to foresee the danger to its employees from the Reliance pump iron. *Id.* at 34 (citing *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1083 (D.C. Cir. 2007).) The Court does not agree.

In *Sasser*, the Commission identified several factors supporting an employer's reasonable reliance upon a contractor. Among other things, the employer's employees never performed the contractor's work; the employer hired a contractor whenever that work was performed; the hazard fell within the expertise of the contractor; the contractor had direct control over the cited hazard; and the contractor had previously performed work for the employer without accident. *Sasser*, 1984 WL 34886, at *3-4. This case is distinguishable.

Although TCP could not control the condition of the pump iron or the valve sequencing, it could, as discussed *supra*, control the cited hazard of employees standing in proximity to pressurized equipment. *Cf. Id.* at *4 ("only the crane operator had direct control over the cited hazard and could assure that the crane maintained sufficient clearance from the power lines"). At

---

[30] Having concluded that TCP had actual knowledge, the Court declines to address whether it had constructive knowledge. *See Phoenix Roofing*, 1995 WL 82313, at *4 ("Given that the record establishes actual knowledge, we need not address the question of constructive knowledge.").

the very least, TCP shared control of its employees' positions with Sullivan. Although Sullivan could direct TCP's work at the wellsite, TCP employees had the ability to "stop work" if they observed unsafe conditions. Tr. 161, 353. Although TCP had previously worked with Brammer, Reliance and Edwards, it had not worked with Sullivan, who had ultimate control over the worksite, and had not worked with Jaguar or the Jaguar crew,[31] which assembled the pump iron and, along with Edwards, was responsible for bleeding off the well. Tr. 133, 352-53. Because TCP lacked a previous relationship with Sullivan and the Jaguar crew, it could not reasonably rely on their expertise. *Cf. Sasser*, 1984 WL 34886, at *4 (finding crane operator had performed work for the employer "three or four times previously without accident").

Further, to successfully invoke the reasonable reliance defense, "[a]n employer may not assume a subcontractor has taken required safety precautions without reasonable inquiry." *Manua's*, 2018 WL 6171790, at *3 (citing *Blount Int'l Ltd.*, No. 89-1394, 1992 WL 277011, at *7 n.3 (OSHRC Sept. 18, 1992)). Here, TCP failed to heed several red flags or to pose safety questions to the other contractors on the day of the accident. Supervisor Walker testified that he asked for the well procedures, but Sullivan indicated he did not have a copy. Tr. 169-70, 320, 358. TCP was neither present nor inquired about whether the pump iron was pressure tested. Tr. 145-46, 155-57, 370-71. TCP did not participate in a JSA or risk assessment or conduct its own safety analysis that discussed working around pressurized equipment or potential safety measures, such as buffer zones. Tr. 119, 129, 208-09, 346-47, 381. Supervisor Walker testified there was no "official safety meeting" that day with a job safety analysis and sign-in sheet. Tr. 346. And TCP did not internally discuss working around pressurized equipment or setting up a buffer zone to mitigate the hazard. Tr. 208-09, 348-49, 371-72. TCP did not inquire about the use of line restraints with Sullivan, Jaguar, or Reliance, despite the fact this safety measure was used roughly half of the time on previous jobs. Tr. 126-27, 364. Taken together, TCP has not shown it reasonably relied on the other contractors.

For all the foregoing reasons, the Court concludes the Secretary has established a violation of the general duty clause since TCP failed to render its workplace free of a hazard, which was recognized, and caused or was likely to cause death or serious physical harm. The Secretary also carried his burden to show that demonstrably feasible measures would materially reduce the

---

[31] Supervisor Walker and B. Walker testified they had not worked with Jaguar, but McLelland testified he had worked with Jaguar "a handful of times," but not with the crew at the wellsite. Tr. 218.

likelihood that such injury as that which resulted from the cited hazard would have occurred. Finally, because the Court concluded that TCP had actual knowledge of the hazard, the affirmative defense of reasonable reliance is not available to TCP, and even if it was, the defense failed on the merits.

## IV. PENALTY DETERMINATION

Under the Act, the Secretary has the authority to propose a penalty. *See* 29 U.S.C. §§ 659(a). Here, the Secretary proposes a $6,250.00 penalty for the serious violation.[32] However, Congress vested the Commission with the final "authority to assess all civil penalties provided in [the Act]," which it determines *de novo*. 29 U.S.C. § 666(j); *see also Chao*, 401 F.3d at 376 ("The Commission has the exclusive authority to assess penalties once a proposed penalty is contested."). Section 17(j) requires that when assessing penalties, "due consideration" must be given "to the appropriateness of the penalty with respect to the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations." 29 U.S.C. § 666(j). "'These factors are not necessarily accorded equal weight.'" *Chao*, 401 F.3d at 376 (citation omitted). "Gravity of [the] violation is the key factor." *Ibid.* (citation omitted).

"The gravity of a particular violation can range from *de minimis*, where there is very low potential for injury or occupational illness, to severe, where death or serious physical injury would be likely." *Nacirema Operating Co., Inc.*, No. 4, 1972 WL 4040, at *2 (OSHRC Feb. 7, 1972). The gravity assessment "depends on: (1) the number of employees exposed; (2) the duration of the exposure; (3) whether any precautions were taken against injury; and (4) the probability that an accident would occur." *Trinity Indus., Inc.*, No. 95-1597, 2003 WL 1961263, at *21 (OSHRC Apr. 26, 2003), *aff'd*, 107 F. App'x 387 (5th Cir. 2004) (unpublished).

---

[32] Section 17(b) of the Act mandates that any employer who has received a citation for a serious violation "shall be assessed a civil penalty of up to $7,000 for each such violation." 29 U.S.C. § 666(b). However, in 2015 Congress passed the Federal Civil Penalties Inflation Adjustment Act of 1990 as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (Inflation Adjustment Act), which requires federal agencies to adjust civil penalties for inflation each year. *See* Bipartisan Budget Act of 2015, Pub. L. 114-74, § 701, 129 Stat. 584, 599 (2015) (codified at 28 U.S.C. § 2461 note). At the time of the citation, the maximum penalty for a serious violation was $14,502.00. *See* Department of Labor Federal Civil Penalties Inflation Adjustment Act Catch-Up Adjustments for 2022, 87 Fed. Reg. 2328, 2336 (Jan. 14, 2022); *see also* 29 C.F.R. § 1903.15(d)(3) (2022).

With respect to the gravity of the violation here, the Secretary determined, and the Court agrees, the gravity of the violation was "high." At least two TCP employees, B. Walker and McLelland, were exposed to the alleged hazard of standing near pressurized equipment for one day, and their exposure was intermittent. Tr. 601. TCP also did not take precautions against injury the day of the accident, such as completing a JSA or risk assessment, inquiring whether the pump iron had been pressure tested, inquiring whether line restraints would be used, instructing its employees to stay away from pressurized equipment, especially during the bleeding off pressurized equipment, or implementing one of the proposed abatement methods. Thus, the probability that an accident would occur was high. *See Capform, Inc.*, No. 99-0322, 2001 WL 300582, at *4 (OSHRC Mar. 26, 2002) (citation omitted) (finding precautions did not reduce the gravity to employees who must work in the area), *aff'd*, No. 01-60417, 2002 WL 35650276 (5th Cir. Mar. 20, 2002) (unpublished). And the injuries and fatalities demonstrate "the consequences of employee exposure to the" pressurized equipment were "death or severe injury." *Cf & T Available Concrete Pumping Inc.*, No. 90-329, 1993 WL 44415, at *5 (OSHRC Feb. 5, 1993) (weighing brief and unlikely exposure due to protective measures taken by the employer against severity of the potential injury from the hazard). *See also, Nat'l Eng'g & Contracting Co.*, No. 94-2787, 1997 WL 603013, at *6 (OSHRC Sept. 30, 1997) ("The gravity here is severe because the violation directly resulted in the death of one employee and the serious injury to another."), *aff'd*, 181 F.3d 715 (6th Cir. 1999). The Court therefore concludes the gravity of the violation was severe.

With regard to good faith, it "should be determined by a review of the employer's own occupational safety and health program, its commitment to the objective of assuring safe and healthful working conditions, and its cooperation with other persons and organizations (including the Department of Labor) seeking to achieve that objective." *Nacirema*, 1972 WL 4040, at *2. The Secretary did not propose a reduction for good faith. TCP did not have a comprehensive safety program, and, even if it did, there is no evidence it took any measures to enforce it. *See Capform*, 2001 WL 300582, at *5 (finding no reduction for good faith where, despite a comprehensive written safety program and written enforcement program, employer's program and toolbox meetings failed to address work performed and hazards). As indicated *supra*, TCP also did not take precautions against injury the day of the accident, such as completing a JSA or risk assessment, and it did not inquire with the other contractors about whether line restraints would be

used. Based upon these factors, the Court concludes TCP is not entitled to a reduction for good faith.

The Secretary also did not propose any adjustments for history since TCP did not have an inspection in the preceding five years which resulted in violations. The Court concludes TCP is not entitled to an adjustments for history. As to size, TCP had 17 employees at the time of the accident. Tr. 599. The Secretary proposed a 60% size reduction. The Court concludes that a 60% size reduction is appropriate. Lastly, there is no indication in the record that TCP disputes the penalty. *See KS Energy Servs., Inc.*, No. 06-1416, 2008 WL 2846151, at *7 n.11 (OSHRC July 14, 2008) (assessing proposed penalty where not in dispute).

Therefore, giving due consideration to the appropriateness of the penalty with respect to the size of TCP's business, the gravity of the violations, the good faith of TCP, and the history of previous violations, the Court concludes a penalty in the amount of $6,250.00 is appropriate. Accordingly,

## V. ORDER

**IT IS HEREBY ORDERED THAT** amended citation 1, Item 1, is **AFFIRMED** and a penalty of $6,250.00 is **ASSESSED**.

**SO ORDERED.**

**JOHN B. GATTO, Judge**

Dated: May --------, 2025
       Atlanta, GA

## CERTIFICATE OF SERVICE

This is to certify that a copy of the Notice/Decision was sent to the parties listed below ☒ electronically using the Commission's E-Filing System ☐ by first class mail on April 28, 2025.

OSHRC Docket No. **23-1002**

**For the Secretary:**

John Rainwater, Regional Solicitor
U.S. Department of Labor
Office of the Solicitor
525 South Griffin Street, Suite 501
Dallas, TX 75202
Attention: Allyson D. Gault, Esq.
Email: gault.allyson.d@dol.gov
Email: docket.dallas@dol.gov

**For the Respondent:**

Brian Lee Hurt, Esq.
Darren S. Harrington, Esq.
Steptoe & Johnson, PLLC
500 North Akard Street, Suite 3200
Dallas, TX 75201
Email: brian.hurt@steptoe-johnson.com
Email: dharrington@steptoe-johnson.com

*/s/ Arvetta D. Diggs*
Arvetta D. Diggs, Legal Assistant

Post Office Address:
Judge John B. Gatto
Sam Nunn Atlanta Federal Center
100 Alabama St. S.W
Building 1924 Room 2R90
Atlanta, GA 30303-3104
Phone: 404-562-1640
Fax: 404-562-1650
Email: adiggs@oshrc.gov