**ORAL ARGUMENT NOT YET SCHEDULED**

**NO. 25-1173**

---

**DISTRICT OF COLUMBIA COURT OF APPEALS**

---

TCP SPECIALISTS, LLC

Petitioner

v.

Occupational Safety and Health Review Commission

Respondent

---

On Petition for Review of an Order of the
Occupational Safety and Health Review Commission

---

**BRIEF OF PETITIONER, TCP SPECIALISTS, LLC**

---

Date: December 8, 2025          Darren S. Harrington (Bar No. 66396)
                                Brian L. Hurt (Bar No. 66398)
                                STEPTOE & JOHNSON PLLC
                                500 North Akard Street, Suite 3200
                                Dallas, TX 75202
                                Ph:    (214) 251-8005
                                Fax:   (214) 393-4099
                                Email:      Darren.Harrington@Steptoe-Johnson.com
                                            Brian.Hurt@Steptoe-Johnson.com
                                Counsel for Petitioner, TLC Specialists, LLC

# DISCLOSURE STATEMENT

*Petitioner (TCP Specialists, LLC)*

TCP Specialists, LLC is represented by Darren S. Harrington and Brian L Hurt of the law firm Steptoe & Johnson PLLC.

TCP Specialists, LLC is a privately held company that does not have a parent company or a publicly held corporation that is a member of the company.

*Respondent (Occupational and Health Review Commission)*

*Occupational and Health Review Commission* is represented by Amy S. Tryon, Office of the Solicitor, U.S. Department of Labor.

# TABLE OF CONTENTS

**Cases**                                                        **Page(s)**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES………………………………………….   i

JURISDICTIONAL STATEMENT……………………………………   6

STATEMENT OF ISSUES ON REVIEW………………………………...   7

STATEMENT OF CASE…………………………………………………..   8

STATEMENT OF FACTS……………………………………………………   9

SUMMARY OF THE ARGUMENT……………………………………………   13

ARGUMENT……………………………………………………………………   14

    I.    THE ALJ'S DEFINITION OF THE HAZARD VIOLATES COMMISSION PRECEDENT AND FAILS TO GIVE THE CONSTITUTIONALLY REQUIRED FAIR NOTICE TO TCP OF THE VIOLATIVE CONDITIONS

    II.   THE SECRETARY AND THE ALJ FAILED TO PROPERLY DEFINE THE HAZARD AT ISSUE

    III.  AS APPLIED IN THIS CASE, THE GENERAL DUTY CLAUSE IS UNCONSTITUTIONALLY VAGUE AND FAILS TO PROVIDE THE REQUISITE NOTICE UNDER THE DUE PROCESS CLAUSE.

CONCLUSION…………………………………………………………..   49

CERTIFICATE OF COMPLIANCE……………………………………   49

CERTIFICATE OF FILING AND SERVICE …………………………   51

# TABLE OF AUTHORITIES

**Cases**                                                                           **Page(s)**

*Alabama Power Co.*, 13 BNA OSHC 1240, 1987 CCH OSHD
   ¶ 27**,** 892 (No. 84-357, 1987)……………………………………… 46

*Arcadian Corp.*, 20 BNA OSHC 2001, 2007 (No. 93-0628, 2004)…… 29

*Baroid Div. of NL Indus., Inc. v. OSHRC*, 660 F.2d 439, 444 (10th Cir.
   1981)…………………………………………………………… 16, 33

*Beverly Enters, Inc.*, 19 BNA OSHC 1161 (OSHRC October 27,
   2000)…………………………………………………………… 46

*Brennan v, OSHRC,* 501 F.2d 1196, 1198, 1200 (7th Cir. 1974) ……… 23

*Brennan v, OSHRC,* 502 F.2d 946, 951-52 (3d Cir. 1974)……………... 23

*Chevron Oil Co.*, 11 BNA OSHC 1329, 1331, n. 6 (No. 10799,
   1983)…………………………………………………………… 16, 25

*ComTran Grp., Inc.,* 722 F.3d 1304, at 1306 (11th Cir. 2013)…………. 45

*Cont'l Oil Co. v. OSHRC,* 630 F.2d 446, 448 (6th Circ.
   1980)…………………………………………………………… 23

*Davey Tree,* 11 BNA OSHC at 1899, 1983-84 CCH OSHD at
   p. 34,399……………………………………………………………. 20

*FMC Corp.*, 12 BNA OSHC 2008, 2009-10 (No. 83-488, 1986)
   (consolidated)…………………………………………………… 19

*Gen. Dynamics Corp., Quincy Shipbuilding Div. v. OSHRC,*
   599 F.2d 453, 458, 464 (1st Cir. 1979)……………………………… 23

*Getty Oil Co. v. OSHRC,* 530 F.2d 1143, 1145 (5th Cir. (1976)………… 23

*Kansas City Power & Light Co.*, 10 BNA OSHC 1417, 1422
   (No. 76-5255, 1982*)*……………………………………………….. 14

*K.E.R. Enters,* 23 BNA OSHC at 2242………………………………… 16

*Martin Contruction, Inc.,* 2007 WL 4963590, at *7 (No. 06-0700,

March 5, 2007)…………………………………………………………… 39

*Missouri Basin*, (Dec. 10) No. 13-1817, 2018 WL 1309482 at *2,
   *6 (OSHRC Mar. 1, 2018)………………………………………… 27, 47,
                                                                         48

*Morrison-Knudsen Co.,* 16 BNA OSHC 1105, 1121 (No. 88-0572,
   1993)………….................................................................. 25

*National Realty & Constr. Co. v. OSHRC,* 489 F.2d at 1266 (D.C. Cir.
   1973)……………….......................................................... 18, 20

*National Realty & Constr. Co. v. OSHRC,* 489 F.2d 1257, 1265-66
   D.C. Cir. 1973………………………………………………… 23

*Otis Elevator Co.*, 21 BNA OSHC 2204, 2207 (No. 03-1344,
   2007)……………………………………………………..……….. 33, 34

*Pelron Corp.*, 12 O.S.H. Cas. (BNA) 1833, 1986 WL 53616
   (OSHRC  June 2, 1986)…………………………………………… 18, 20,
                                                                         21

*Phoenix Roofing, Inc.,* 17 BNA OSHC 1076, 1079-80 (No. 90-2148,
   1995); (Dec. 23)………………………………………………… 34, 36,

*Precision Concrete Constr.*, 19 BNA OSHC 1404, 1407
   (No. 99-0707, 2001)…………………………………………… 38

*REA Express, Inc. v. Brennan,* 495 F.2d 822, 826 (2d Cir.
   1974)………………………………………………………….. 23

*Rolly Marine Service Company*, 2021 WL 6424920 at *10
   (No. 20-0208, Nov. 22, 2021), <u>quoting</u> *Arcadian Corp.,*
   20 BNA OSHC 2001, 2009 (No. 93-0628, 2004)…………………… 25, 26

*SeaWorld v. Perez*, 748 F.3d 1202, 1215 (D.C. Cir. 2014),
   *Id.* at 1207 (quoting *Fabi Constr.*, 508 F.3d at (1081)………………... 21, 22,
                                                                         45

*Secretary v. Asplundh Tree Expert, LLC*, 2023 WL 7318191, *14-16
   (No. 21-0497, 2023)…………………………………………… 33, 36,
                                                                         37

*Secretary of Labor v. A. Prokosch & Sons Sheet Metal, Inc.*, 8 OSH Dec.
   (CCH) P 24840, 1980 WL 10666 (OSHRC (1980)…………………… 29

*Sec'y of Labor v. Sasser Electric& Manufacturing Company*, 11 BNA OSHC 2133, 2137 (No. 82-178, 1984)…………………………………………… 39, 40

*Tampa Shipyards, Inc.,* 15 BNA OSHC 1533, 1537 (No. 86-360, 1992) (Consolidated)…………………………………………………………… 33, 34

*Titanium Metals Corp. of Am. v. Usery,* 579 F.2d 536, 543-44 (9th Cir. 1978…………………………………………………………………… 23

*Unted States Postal Serv. Nat'l Ass'n of Letter Carriers,* 21 O.S.H. Cas. (BNA) ¶ 1767 (OSHRC Nov. 20, 2006)……………………………….. 45

*Waldon Health Care Ctr.*, 16 BNA OSHC 1052, 1060 (Nos. 89-2804, 1993) (consolidated)…………………………………………………………… 29

*Well Sols, Inc. Rig No. 30* (Dec. 10) (No. 91-340, 1995 WL 242595, at *2 (OSHRC April 19, 1995)…………………………………………… 27

**Miscellaneous**

OSHA Standards:

29 CFR 1910.147(a)(2)(iii)(B); 1910.147(b)…………………………………………………………...........29, 30

29 CFR 1910.119……………………………………………………………..21, 39

Industrial Association Standards:

API RP 54……………………………………………………………..12, 13, 17, 19, 28, 31, 32, 37, 43, 48

OSHA Documents

OSHA FOM, Chapter 4, Section 111.B8, https://www.osha.gov/fom/chapter-4............................................................................................... 47

**Other**

H.R. Rep. No. 91-1291 at 21-22
(1970)……………………………………………………………………     23

**Statutes:**

Section 11 of the Occupational Safety and Health Act of 1970

29 U.S.C. § 660

**Other:**

Fed. R. App. P. 15

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this Petition for Review under Section 11 of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 660, and Fed. R. App. P. 15.  The Occupational Safety and Health Commission entered its Final Order on June 11, 2025, and the Petition for Review was filed with this Court on August 8, 2025.

# I.    STATEMENT OF ISSUES ON REVIEW

A.    The ALJ's vague definition of the recognized hazard under 5(a)(1) as "working in close proximity to pressurized equipment" misapplies Commission precedent by failing to specifically identify the pressurization of a corroded piping as the actual hazardous condition.

B.    The ALJ's vague definition of the recognized hazard under 5(a)(1) as "working in close proximity to pressurized equipment" fails to give the constitutionally required fair notice to TCP of the violative conditions.

C.    The ALJ's finding that the failure to maintain a buffer zone around the piping at issue constitutes a recognized hazard under 5(a)(1) misapplies Commission precedent by defining the recognized hazard as the absence of a specific abatement method.

D.    The ALJ's finding that the failure to maintain a buffer zone around piping owned, maintained and operated by another employer constitutes a recognized hazard under 5(a)(1) is not supported by substantial evidence and misapplies the applicable law because it is undisputed that no such buffer zone is required for other similarly pressurized equipment at the worksite at issue.

E.    The ALJ's finding that TCP could reasonably be expected to exercise control over the hazardous condition created by the rupture of a corroded pipe maintained and operated by another employer is unreasonable, misapplies the applicable law and is not supported by substantial evidence.

F.    The ALJ's finding that TCP had actual knowledge of the recognized hazard is not supported by substantial evidence where the hazard created by the corroded piping was maintained and operated by another specialty contractor.

G.     The ALJ's finding that TCP had actual knowledge of the recognized hazard is not supported by substantial evidence where it is undisputed that no buffer zone is required for other similarly pressurized equipment at the worksite.

H.     TCP reasonably relied on the specialty contractors who owned, maintained, and operated the piping to inspect and pressure test the piping before relying on the piping for the task at issue.  Because the ALJ failed to properly identify the hazardous condition as the pressurization of the corroded piping, the ALJ misapplied the law in finding that TCP could not reasonably rely on the specialty contractors to exercise control over the hazardous condition creating by corroded piping. In addition, the ALJ's finding is not supported by substantial evidence.

I.     The ALJ misapplied the law and erred in finding TCP's multiple means of abatement inadequate. In addition, the ALJ's finding is not supported by substantial evidence.

J.     The ALJ misapplied the law in finding that the Secretary established the feasibility and likely utility of the proposed alternative means of abatement. In addition, the ALJ's finding is not supported by substantial evidence.

## II.     <u>STATEMENT OF CASE</u>

TCP was unreasonably cited by OSHA under its general duty clause for the rupture of corroded piping that was owned and operated by other specialty subcontractors with whom TCP had no contractual relationship.  The hazardous condition was, according to the Secretary's own expert witness, the piping's corroded condition and improper use by the other specialty contractors.  It is undisputed that the piping's corrosion and the improper use of the piping were not foreseeable to TCP.  The other specialty contractors were responsible for the

piping's inspection and pressure testing to ensure it was safe to be pressurized. The other specialty contractors were also responsible for the safe operation of the piping. Finally, the other specialty contractors were responsible for determining whether a buffer zone or line restraints were necessary based on their expertise. For the reasons stated below, the Judge's decision in this case should be reversed.

## III.    STATEMENT OF FACTS

This case arose following the rupture of a pipe being used to bleed pressure from a well on a multi-employer worksite in St. Augustine, Texas on December 5, 2022. TCP is a specialty contractor that was onsite to perform specific wireline services after a flowback operation was completed. The ruptured pipe used to bleed pressure from the well was neither owned nor operated by TCP.

The ruptured piping was owned by Reliance Well Services (Reliance), a separate specialty employer on site.[1] At the time of the incident, the Reliance piping was being operated by Jaguar Energy Services (Jaguar), another specialty contractor. Jaguar was operating the piping under the direction of Buster Sullivan (Sullivan), the wellsite supervisor, an independent contractor hired by Brammer Engineering (Brammer), the operator on the lease.  Tr: 260:23-265:18. Sullivan and Jaguar represented to the Reliance tool pusher/site supervisor that the Reliance piping would not be used under pressure, but rather would be used as an open conduit to

---

[1] The ruptured pipe will be hereinafter referred to as the "Reliance piping."

vent pressure from the well. Tr: 263:7-265:18. Based on this representation, Reliance allowed Jaguar to use  piping.

TCP's role on the site was limited to wireline services, and its employees did not participate in the selection, inspection, pressure-testing, or operation of the Reliance piping. The Secretary stipulates that TCP was *not* the controlling, creating, or correcting employer (as those terms are defined by OSHA in its multi-employer citation policy) regarding the struck-by hazard created by the ruptured piping.

TCP was on-site only a few hours for the narrow purpose of providing wireline services following the completion of the flowback operation. Once hydraulic fracking is completed on a well, the fluids used to perform the fracking are "flowed back" out of the well in a high-pressure operation. After the flowback operation was completed, Jaguar removed much of its specialized flowback equipment from the site and began re-working under normal conditions using a variety of services provided by other contractors, including the wireline services provided by TCP.  Tr. 557:9-558:3, 579:19-580:2. Due to the high pressures involved, wireline services are not even possible during flowback operations. Tr: 556:17-557:8; 557:9-558:3, 579:19-580:2; 649:13-653:22.

Notably, Jaguar used the Reliance piping safely to bleed surface pressure from the well during the first wireline service provided by TCP earlier that day. During the first bleed-down, Jaguar did not pressurize the Reliance piping, but rather used

a valve sequence that slowly allowed pressure to be vented through the Reliance piping. See Joint Stipulation (Joint Stip.) 14. During TCP's second wireline service, Jaguar and Sullivan decided to use a different valve sequence procedure that required the Reliance piping to first be pressurized before it was opened to bleed the pressure from the well. The reason for this decision by Jaguar and Sullivan was not established at trial. Tr: 368:13-374:3. TCP was not included in these discussions or operations because operating the valves on Jaguar's equipment is outside of both TCP's scope of work and its expertise. Tr: 368:13-374:3.

Jaguar did not inspect or pressure-test the Reliance piping prior to pressurizing it. OSHA's expert confirmed that the standard industry practice required Jaguar to inspect and pressure-test the Reliance piping prior to pressurizing it. OSHA's expert testified that if Jaguar had inspected and then pressure-tested the Reliance piping, it would have prevented the piping from rupturing.

In addition, Jaguar's operator inadvertently opened a valve in the wrong order resulting in the Reliance piping being pressurized instantly instead of allowing the pressure to build more slowly in the piping. The Secretary stipulated that the rupture of the piping could have been avoided if Jaguar had used the same valve sequence procedure it followed earlier that day to bleed down the pressure in the well. See Joint Stip. 14. TCP had no reason to know that Jaguar was using corroded piping borrowed from Reliance that had not been pressure tested, or that Jaguar was

deviating from a procedure that would prevent the corroded piping from being pressurized. Tr: 542:6-543:17, Tr:542:6-543:17, 584:15-585:20, Tr.605:23-606:2, 564:12-565:1, Tr.570:13-18.

Jaguar did not use line restraints or require that a buffer zone be established around the Reliance piping. The use of these abatement measures is based on a risk assessment performed by Jaguar and, as such, are not always necessary. OSHA's expert testified that TCP had no reason to know that Jaguar did not properly inspect or pressure-test the Reliance piping before pressurizing it to bleed down the well. OSHA's expert also testified that TCP was not qualified nor responsible for performing a risk assessment of the piping to determine if line restraints or a buffer zone were needed.

OSHA cited TCP under the general duty clause alleging TCP violated the section of API 54 addressing flowback operations, even though the flowback operations were completed before TCP arrived onsite. TCP's work did not involve flowback operations and no flowback operations were being performed at the time of the line rupture. Tr: 646:15-650:22, 147:17-149:4, 375:5-377:23. OSHA's expert confirmed that the oil and gas industry *does not* consider relieving surface pressure from a well to be part of a flowback operation. Tr: 557:9-558:3, 579:19-580:2. Almost all of Jaguar's essential high-pressure equipment for the flowback operation had been taken off site by Jaguar before TCP's arrival, including Jaguar's

sand separator, plug catcher, and flowback piping.  Tr: 649:13-653:22. The Reliance

piping was not a flowback line used during flowback operations, and is therefore not

covered by the API 54 section cited by OSHA in its citation.

Further, the flowback section in API 54 does not mandate, but rather merely

suggests using line restraints or a buffer zone on flowback lines during flowback

operations.  It is undisputed that the possible use of line restraints or a buffer zone

would be determined by Jaguar based on Jaguar's risk assessment.  Finally, it is

undisputed that TCP did not have the expertise to participate in this risk assessment

and was therefore not responsible for this risk assessment.

The ALJ affirmed the citation on the grounds that TCP should have known a

buffer zone was required simply because its employees were working in close

proximity to pressurized equipment.  OSHA's expert acknowledged that that

employees routinely work safely in close proximity to pressurized equipment

without a buffer zone while performing well work such as wireline services.

## IV.   SUMMARY OF ARGUMENT

The ALJ erred in affirming the citation where both the Secretary and the ALJ

failed to properly define a recognized hazard over which TCP could reasonably be

expected to exercise control. Simply because TCP's employees were exposed to the

struck by hazard created by the rupture of the Reliance piping is insufficient to

establish a violation of the general duty clause.  An accident, by itself, is not enough

to establish a violation of the general duty clause. It is "[t]he hazard, not the specific incident resulting in injury, [that] is the relevant consideration in determining the existence of a recognized hazard." *Kansas City Power & Light Co.*, 10 BNA OSHC 1417, 1422 (No. 76-5255, 1982*).* The struck by hazard in this case was the corroded Reliance piping that ruptured while mis-used by Jaguar to bleed pressure from the well.

The Citation should be vacated because (1) the Secretary improperly defined the recognized hazard as the absence of certain abatement methods, (2) the Secretary failed to identify and prove a recognized hazard over which TCP could reasonably be expected to exercise control, (3) TCP reasonably relied on the expertise of specialty contactors to protect against hazards related to their own equipment and procedures, (4) the Secretary failed to prove TCP had actual or constructive knowledge of any alleged violative conditions, (5) the Secretary failed to show the existing safety-related procedures in place were inadequate, (6) the Secretary failed to prove that her proposed abatement methods were applicable to the work conditions, and (7) the Secretary failed to prove that her recommended abatement methods were feasible or likely to materially reduce the incidence of the alleged hazards.

## IV.  ARGUMENT

For the reasons stated below, the ALJ erred in holding the Secretary met his burden that TCP violated the General Duty Clause.

**A**.  **The Citation does not properly define a "recognized hazard"**

The ALJ erred in broadly defining the hazardous condition as simply working

in close proximity to pressurized equipment. (Decision 9). Employees across a large variety of industries work safely in close proximity to pressurized equipment every day. Notably, OSHA's specific standards governing welding and pressurized systems in refineries allow employees to not only work next to pressurized equipment[2], but actually work on pressurized equipment.[3] If OSHA permits directly working on pressurized equipment under its specific standards, then merely working in close proximity to pressurized equipment cannot be a violative condition under the general duty clause.

The ALJ erred in conflating the evidentiary issue requiring the Secretary to define the actual hazardous condition with the Secretary's burden to prove the employee was *exposed* to the hazardous condition, as might be determined by the employee's close proximity to the hazard. The ALJ's vague definition of the hazard is at odds with the applicable Commission law on point.

In contrast, the Secretary's own expert properly defined the hazardous condition to be Jaguar's pressurization of the corroded piping. On this critical point, TCP's expert agreed with the Secretary's expert. Because the evidence is clear that TCP could not reasonably be expected to exercise control over Jaguar's

---

[2] Process Safety Management Standard 29 CFR 1910.119. There is no prohibition against working in close to pressurized equipment in a standard dedicated to working safely with pressurized equipment.

[3] Control of Hazardous Energy 29 CFR 1910.147(a)(2)(iii)(B); 1910.147(b) ("*Hot tap*. A procedure used in the repair, maintenance and services activities which involves welding on a piece of equipment (pipelines, vessels or tanks under pressure, in order to install connections or appurtenances. It is commonly used to replace or add sections of pipeline without the interruption of service for air, gas, water, steam, and petrochemical distribution systems.)

pressurization of the corroded piping, the Secretary instead attempted to define the hazard as the absence of abatement methods, such as line restraints or a buffer zone. The ALJ properly rejected the absence of line restraints as constituting a hazardous condition, however the ALJ erred in affirming the citation on the grounds that TCP failed to implement a buffer zone that would prevent its employees from working "in close proximity to pressurized equipment." (Dec. 9) Thus, the ALJ improperly redefined the hazardous condition in overly broad terms that fails to give TCP fair notice that a violation of the General Duty Clause existed.

i.    The Secretary and the ALJ failed to properly define the hazard at issue

Establishing a violation of the general duty clause requires that the Secretary first define the hazard at issue. *K.E.R. Enters.*, 23 BNA OSHC at 2242. "A safety hazard at the worksite is a condition that creates or contributes to an *increased risk that an event* causing death or serious bodily harm to employees will occur." *Baroid Div. of NL Indus., Inc. v. OSHRC*, 660 F.2d 439, 444 (10th Cir. 1981)(emphasis added). Significantly, a hazard is not defined by the absence of a particular abatement method such as the buffer zone at issue in this case, but rather a hazard is defined "in terms of the physical agents that could injure employees ...." *Id.* (citing *Chevron Oil Co.*, 11 BNA OSHC 1329, 1331 n.6 (No. 10799, 1983)). As such, the ALJ erred in identifying the hazardous condition by citing the absence of a buffer zone.

The Citation in this case states as follows:

OSH ACT of 1970 Section 5(a)(1): The employer did not furnish

employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees in that employees were exposed to fire, explosion, and struck-by hazards while depressurizing a frac stack.

On or about December 5, 2022, employees were standing in close proximity to the frac stack and pressured piping during depressurization of the frac stack when piping ruptured. The employer did not ensure all flowlines and relief lines were restrained to prevent whipping or designate a buffer zone. This condition exposed employees to fire, explosion, and struck-by hazards.

Among other methods, feasible and acceptable abatement methods to correct this hazard is to follow American Petroleum Institute (API) Recommended Practice (RP) 54, Occupational Safety and Health for Oil and Gas Well Drilling and Servicing Operations, section 16.8, which states "All flowlines and relief lines should be restrained to prevent potential whipping of lines or a designated buffer zone established."

The citation does not properly define a hazardous condition. Rather, the citation broadly states that "employees were exposed to fire, explosion and struck-by hazards while depressurizing a frac stack." Depressurizing a well, as in this case, is intentional, normal activity in the oil and gas industry and does not, in itself, identify a hazardous condition that increases the likelihood of an event that might cause death or serious harm to provide an employer fair notice of its obligations under the general duty clause, the Secretary is obligated to identify a specific hazardous condition that makes de-pressurizing the well unsafe.

The TCP employees stated they have performed wireline operations while wells were safely depressurized hundreds of times during their careers. Tr: 146:21-147:12, 224:23-226:17; 358:22-359:7. Though depressurizing a well is, by its nature, a *potentially* dangerous activity, the danger only exists where a hazardous

condition develops. Depressurizing a well cannot be avoided. What can be avoided is pressurizing a corroded pipe in the course of bleeding off a well. For this reason, the hazard at issue in this case is Jaguar's pressurization of the corroded Reliance piping, which Jaguar was required to inspect and pressure test before pressurizing it.

As such, the broadly worded "exposed to fire, explosion and struck-by hazards while depressurizing a frac stack", standing alone, cannot be a valid recognized hazard under Section 5(a)(1). In *Pelron Corp.*, The Commission set forth the basis for its decision:

> Obviously, some industrial activities are by their very nature dangerous. To permit the normal activities in such an industry to be defined as a "recognized hazard" within the meaning of section 5(a)(1) is to eliminate an element of the Secretary's burden of proof and, in fact, almost to prove the Secretary's case by definition, since under such a broadly formula the employer can never free the workplace of inherent risks incident to the business. To define a struck by hazard as broadly as the citation in this case undermines the congressional purpose behind the "recognition" element— to limit the general duty imposed by section 5(a)(1) to *preventable* hazards for which the employer has fair notice.

12 O.S.H. Cas. (BNA) 1833, 1986 WL 53616 (OSHRC June 2, 1986); See *National Realty & Constr. Co. v. OSHRC*, 489 F.2d at 1266 (D.C. Cir. 1973). TCP was not given fair notice that working in close proximity to pressurized equipment is, a violation of the general duty clause.

Here, the Secretary must identify a *specific* hazardous condition related to "depressurizing a frac stack" that creates or contributes to an increased risk that an event causing death or serious bodily harm to employees will occur. Notably, the

hazards "recognized" in API RP 54 for flowback operations are inapplicable because TCP was not engaged in a flowback operation.

In *FMC Corp*, 12 BNA OSHC 2008, 2009-10 (No. 83-488, 1986) (consolidated), the Commission rejected the Secretary's effort to define the hazard as an explosion that may result from applying heat to the chemical processed because defining the hazard as simply the process itself makes it impossible for the employer to rid the workplace of the hazard. Instead, the hazard was identified by the Commission as an explosion that may occur where the temperature in the gasification process is not properly controlled and/or the concentration of the chemical involved in the process is not properly controlled. In contrast to this case, the hazard was not working in close proximity to a chemical process.

In *Pelron*, the Commission rejected the judge's definition of the hazard "very broadly defined" as --"the possibility of accumulations of unreacted ethylene oxide in pressure vessels." To define the alleged hazard as the "possibility" of accumulations of unreacted EtO is to define it in a way that it can never be prevented, since the "possibility" would always exist unless there were absolutely no chance at all that unreacted vapors could accumulate. The Commission held that defining the hazard as the "possibility" that a condition will occur defines only a potential hazard. The same analysis applies here because it is always theoretically possible that pressurized equipment might rupture. Thus the ALJ's hazard definition cannot

stand.

Here, the ALJ's definition of the hazard as working in close proximity to pressurized equipment falls short of the definition rejected in *Pelron*. Working in close proximity to pressurized equipment is not, in itself, a hazard. It only becomes a hazard if the pressurized equipment ruptures, an event that is not caused by the employee's proximity. But even if the hazard was defined as working in close proximity to pressurized equipment *that might rupture*, then the hazard is being improperly defined as a possibility, and not an actual condition. The only proper recognized hazard under the general duty clause here is pressurizing the corroded Reliance piping , since employers are only required to eliminate preventable hazards.

The ALJ erred in defining the hazard broadly as "working in close proximity to pressurized equipment." Significantly, the ALJ does not identify what conditions or procedures might cause the pressurized equipment to rupture. In *Pelron*, the Commission held that to define a hazard as broadly as the ALJ did would undermine the congressional purpose behind the "recognition" element to limit the general duty imposed by section 5(a)(1) to preventable hazards. See *National Realty*, 489 F.2d at 1266 (D.C. Cir. 1973). To respect Congress' intent, hazards must be defined in a way that apprises the employer of its obligations, and identify conditions or practices over which the employer can reasonably be expected to exercise control. *Davey Tree*, 11 BNA OSHC at 1899, 1983-84 CCH OSHD at p. 34,399.

The ALJ erroneously relies on *Seaworld of Florida v. Perez,* 748 F.3d 1202 (D.C. Cir. 2014) to support defining the hazard as working in close proximity to pressurized equipment. (Dec. 10-11). In *Seaworld*, the DC Circuit affirmed that the hazard was properly identified as "close contact with killer whales." The court determined that eliminating close contact with the killer whale was a feasible means of eliminating the hazard because the close contact was not essential to the employer's business activity; i.e., the entertainment value of the trainer's interaction with the killer whale.

Here, the ALJ fails to equate working near pressurized equipment as a comparable hazard to working in close contact with unpredictable killer whales. Instead, the ALJ simply notes that the definition of the hazard in both cases includes the employee's proximity to the hazard. (Dec. 11). This comparison fails. For an unpredictable killer whale, the hazard of the whale biting the trainer does not exist *but for* the employee's close contact with the whale. Simply put, the proximity of the trainer to the whale is a necessary condition for the bite hazard to exist. If the trainer is not in close proximity to the whale, then the whale will not bite, thus there is a causal connection that creates the hazard.

In contrast, the rupture of pressurized equipment is not affected by the employee's proximity to the equipment. The employee's proximity to the pressurized equipment does not contribute to the rupture of the pressurized

equipment. Instead, the employee's proximity to the pressurized equipment only affects the employee's *exposure* to the hazardous condition. Eliminating the employee's exposure to the hazard is an essential element in determining whether a means of abating the hazard is feasible, but it is not relevant to defining the hazardous condition.

*Seaworld* is also inapposite because it does not involve a multi-employer worksite where another controlling employer failed in multiple ways to provide a safe work environment for the trainer. In this case, the hazard created by the ruptured Reliance piping would have been eliminated if Jaguar (the responsible party) had properly inspected and pressure-tested the piping. If Jaguar had performed this duty, the proximity of TCP's employees to the pressurized equipment would not have been a hazardous condition. Further, if the bleed off procedure used by Jaguar earlier in the day had been employed the second time, then the piping at issue would not have been pressurized and the hazard would have been eliminated. *Seaworld* does not involve another specialty contractor directly responsible for taking definitive steps to abate the hazard of a killer whale biting its trainer such that "close contact with the killer whales" would be safe.

In *Seaworld*, the court relied on the following explanation from the House Committee on Education and Labor, "[b]earing in mind the fact that there is no automatic penalty for violation of the general duty, this clause enables the Federal

Government to provide for the protection of employees who are working under such unique circumstances that no standard has yet been enacted to cover this situation." H.R. REP. NO. 91–1291, at 21–22 (1970) (emphasis in original). Working in close proximity to pressurized equipment is not a unique circumstance but rather occurs daily across a wide variety of industries and is explicitly permitted by OSHA in its specific standards.

In a prior DC Circuit case, the court observed that notwithstanding the "unqualified and absolute" textual imperative that the workplace be "free" of the recognized hazard, "Congress quite clearly did not intend the general duty clause to impose strict liability: The duty was to be an achievable one," *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1265-66 (D.C.Cir.1973) (footnote omitted). See also *Cont'l Oil Co. v. OSHRC*, 630 F.2d 446, 448 (6th Cir.1980); *Gen. Dynamics Corp., Quincy Shipbuilding Div. v. OSHRC*, 599 F.2d 453, 458, 464 (1st Cir.1979); *Titanium Metals Corp. of Am. v. Usery*, 579 F.2d 536, 543–44 (9th Cir.1978); *Getty Oil Co. v. OSHRC*, 530 F.2d 1143, 1145 (5th Cir.1976); *Brennan v. OSHRC*, 501 F.2d 1196, 1198, 1200 (7th Cir.1974); *Brennan v. OSHRC*, 502 F.2d 946, 951–52 (3d Cir.1974); *REA Express, Inc. v. Brennan*, 495 F.2d 822, 826 (2d Cir.1974). In this case, the ALJ is erroneously held TCP strictly liable for working in close proximity to pressurized equipment.

<u>As applied in this case, the general duty clause is unconstitutionally vague and fails to provide the requisite notice under the Due Process Clause.</u>

Properly defining the hazard is essential to the constitutional application of the general duty clause. The ALJ's broadly worded definition of the hazard fails to provide the required fair notice that TCP is entitled to under the Due Process clause of the 5th Amendment. The ALJ's decision here is unconstitutionally vague and ambiguous. The broadly defined hazard "standing in close proximity to pressurized equipment" fails to put an employer on notice as to what is legally required for compliance with the general duty clause.

To bring the general duty clause in line with the Due Process rights of employers, courts have imposed constraints on its application. For the most part, these constraints have relied on the term "recognized" when defining the hazard. In other words, the employer purportedly has fair notice of its obligation under the general duty clause because the hazard, otherwise undefined by the law, is already recognized by the employer and/or its industry.

Simply "standing in close proximity to pressurized equipment" is not a hazard recognized by TCP, its industry, or any other industry for that matter. As discussed below, employees work in close proximity to pressurized equipment in a variety of industries, including well site services.  If the ALJ's vague definition of the hazard is deemed consistent with the requirements of the general duty clause, then the

general duty clause itself is unconstitutionally vague.

iii.  The Citation improperly defines the hazard as the absence of abatement methods

The ALJ erred in ignoring the Secretary's expert, TCP's expert, and the fact witnesses, who all identified that hazardous condition as the pressurization of the corroded Reliance piping by Jaguar. (Dec.8) "Proximity of employees to pressurized equipment" improperly defines the hazard as the absence of an abatement method; i.e., a buffer zone. (Dec. 10) Commission case law is clear that "[t]he hazard is not the absence of an abatement method." *Morrison-Knudsen Co.*, 16 BNA OSHC 1105, 1121 (No. 88-0572, 1993).  Instead, the Commission has held that a hazard must be "defined 'in terms of the physical agents that could injure employees rather than the means of abatement.'" *Rolly Marine Service Company*, 2021 WL 6424920 at *10 (No. 20-0208, Nov. 22, 2021), quoting *Arcadian Corp.*, 20 BNA OSHC 2001, 2009 (No. 93-0628, 2004); see also *Chevron Oil Co.*, 11 BNA OSHC 1329, 1331, n.6 (No. 10799, 1983). Here, the absence of a buffer zone was not a hazardous condition.

The Citation describes the violative conditions as follows:

"On or about December 5, 2022, employees were standing *in close proximity to* the frac stack and pressured piping during depressurization of the frac stack and when piping ruptured. The employer did not ensure all flowlines and relief lines were restrained to prevent whipping or designate a buffer zone. *This condition* exposed employees to fire, explosion, and struck-by hazards."

(Emphasis added).

The last sentence of the Citation's alleged violation description ("AVD") refers to "this condition" exposing employees to the cited hazards. The "condition" in the AVD's last sentence can only refer to the previous sentence, which states "The employer did not ensure all flowlines and relief lines were restrained to prevent whipping or designate a buffer zone." Thus, the Citation improperly defines the hazardous "condition" as the absence of the abatement methods OSHA recommends, i.e. line restraints or a buffer zone.

A recognized hazard is not properly identified even if the term, "this condition," refers back to the first sentence of the paragraph where it states that employees were "*standing in close proximity to* the frac stack and pressured piping during depressurization of the frac stack…" (emphasis added). The phrase "[s]tanding in close promixity to…" is simply another way of describing the absence of a buffer zone—one of the two abatement methods recommended by the Secretary within the Citation. The absence of a buffer zone is not a physical agent that can injure employees. As such, the Citation must be vacated because the Secretary "failed to define the hazard in terms of the physical agents that could injure employees, and instead, improperly defined the hazard in terms of the absence of particular abatement methods." <u>See</u> *Rolly Marine Service Company*, 2021 WL 6424920 at *10. The ALJ erroneously defined the hazard as the employee's proximity to pressurized equipment rather than the absence of a buffer

zone because the proximity of the employee was an essential part of the hazardous condition. (Dec. 9). To support this distinction without a difference, the ALJ misinterprets *Missouri Basin Well Services, Inc.*, where the Commission determined that the hazardous condition leading to an explosion was the close proximity between a discharge tank that emitted combustible vapors and a mud pump that provided the ignition source. (Dec. 10); No.13-1817, 2018 WL 1309482 at *2 OSHRC Mar. 1, 2018). In that case, the close proximity between the ignition source and ignitable vapors created a hazardous condition because the short distance was essential for the two pieces of equipment to be close enough together to create the explosion hazard.

In contrast to *Missouri Basin*, the proximity of the TCP employees to the pressurized equipment did not cause or, in any other way, contribute to the rupture of the corroded Reliance piping. The piping would have ruptured regardless of where the employees were standing, whereas the explosion in *Missouri Basin* would not have occurred if the mud pump had been further removed from the discharge tank. Properly understood, the location of the employees to the ruptured piping *exposed* the employees to the ruptured piping, but the employees' location was not essential to the actual hazardous condition.

The ALJ's reliance on *Well Sols., Inc. Rig No. 30*, is similarly misplaced. (Dec 10); See No. 91-340, 1995 WL 242595, at *2 (OSHRC April 19, 1995). In *Wells*

*Sols*, the Commission defined the hazard as the unpredictable nature of a horizontally drilled well in a geological formation. The Well Sols employees performed a "rod and tube" job in preparation of installing a new pump on the well head. The issue before the Commission was whether Well Sols should have recognized the hazard, defined as the unpredictable nature of the well, and insisted on the use of a BOP (blow-out preventer) device while performing its well services.

Unlike here, the employees' proximity to the well is not identified by the Commission as part of the hazardous condition. Indeed, the Commission determined that if a BOP had been installed, then the employees could have safely worked on the pressurized equipment at the well head. The definition of the hazard was also not the absence of the BOP, a method of abatement. The cases relied upon by the ALJ actually demonstrate TCP's position that the employees' proximity to the hazardous condition cannot be the hazardous condition itself.

iv.   The Secretary improperly relied upon a non-mandatory recommendation in an API standard to establish the recognition of the hazard.

The Citation's plain language improperly define the hazard as the absence of certain abatement methods, and OSHA also improperly cited non-mandatory abatement methods to establish a recognized hazard. Because API RP 54 is a "recommended practice," the entirety of API RP 54 is non-mandatory and therefore its recommendations may not be used to establish recognition of a hazard.

*Secretary of Labor v. A. Prokosch & Sons Sheet Metal, Inc.* 8 OSH Dec. (CCH) P 24840, 1980 WL 10666 (OSHRC 1980).

In addition, the cited section only makes a recommendation that line restraints or a buffer zone be used—employing the suggestive term "should" instead of the mandatory term "shall." <u>See</u> Ex. C-28, page 58. Non-mandatory language regarding abatement methods is not permissible to establish industry recognition of a hazard. *Secretary of Labor v. A. Prokosch & Sons Sheet Metal, Inc.* 8 OSH Dec. (CCH) P 24840, 1980 WL 10666 (OSHRC 1980).

Further, the specific section of API RP 54 cited by OSHA is inapplicable to TCP's wireline operations. The section cited by OSHA only applies to "flowback operations." TCP's work did not involve flowback operations. Tr: 646:15-650:22, 147:17-149:4, 375:5-377:23. In sum, the Secretary improperly relied upon non-mandatory abatement actions in an inapplicable section of API RP 54 to establish recognition of a hazard.

 v. <u>The Citation and the ALJ's Decision do not identify conditions over which TCP can reasonably be expected to exercise control</u>

The ALJ fails to define the hazard "in a way that apprises the employer of its obligations and identifies conditions or practices *over which the employer can reasonably be expected to exercise control*." *Arcadian Corp.*, 20 BNA OSHC 2001, 2007 (No. 93-0628, 2004)(*emphasis added*); <u>see also</u> *Waldon Health Care Ctr.*, 16 BNA OSHC 1052, 1060 (No. 89-2804, 1993) (consolidated). The broad definition

"exposed to fire, explosion and struck-by hazards while depressurizing a frac stack" does not meet this standard. The ALJ erred in failing to identify any *specific* hazardous or violative condition over which TCP can reasonably be expected to exercise control.

Although the alleged violative condition was not identified in the Citation, the ALJ defined it as TCP employees working near pressurized equipment. Decision at pg. 9. TCP cannot reasonably be expected to eliminate the identified hazard by never working in close proximity to pressurized equipment while providing wireline services.

The Secretary's expert properly defined the hazardous condition as pressurizing the corroded Reliance piping in the course of bleeding down the well. Tr: 519:20-520:9, 529:4-6, 535:5-536:7. In his decision, the ALJ properly found that Jaguar's pressurization of the corroded Reliance piping is not a hazardous condition over which TCP could have reasonably be expected to exercise control. Decision at pg. 9. This finding must result in the citation being vacated.

Specifically, TCP cannot reasonably be expected to exercise control over the following conditions that resulted in the struck-by hazard created by the ruptured Reliance piping:

- TCP cannot reasonably be expected to exercise control over the decision of Reliance and Jaguar to **NOT** inspect the Reliance piping.

- TCP cannot reasonably be expected to exercise control over the decision of Reliance and Jaguar to **NOT** pressure test the Reliance piping before allowing it to be used to bleed down pressure from the well.

- TCP cannot reasonably be expected to exercise control over the decision of Jaguar and Sullivan to change the original bleed-off procedure that had been safely used earlier on that same day to avoid over-pressurizing the piping.

- TCP cannot reasonably be expected to exercise control over the failure of the Jaguar employee to safely open the wellhead valves in the correct order.

At each step outlined above, a risk assessment was supposed to be performed by Brammer, Reliance and Jaguar to determine what, if any, additional measures were needed to safely bleed pressure from the well, including the possible use of line restraints or a buffer zone. OSHA's expert testified that TCP is not expected to participate in these risk assessments.  Tr: 542:6-543:17, Tr:542:6-543:17, 584:15-585:20, Tr.605:23-606:2.

API RP 54 requires that Reliance, Jaguar and/or Brammer assess the risk of using the Reliance piping regarding the possible use of restraints, pressure test the Reliance piping and maintain the Reliance piping in good operating condition.  See Ex. C-28, Section 7.11.3 and 7.11.4.  As OSHA's expert and the CSHO admit, TCP had no responsibility to inspect the Reliance piping.  Tr: 605:23-606:2. Further, the risk assessment for determining whether line restraints or a buffer zone might be

beneficial was not TCP's responsibility. The Reliance piping should have been pressure tested by either Jaguar or Reliance. Tr: 542:6-543:17, Tr:542:6-543:17, 584:15-585:20, Tr.605:23-606:2.

As OSHA's expert testified, "between Jaguar and Reliance Well Service, someone should have pressure tested the pipe." Tr: 542:18-20. API 54 squarely places the responsibility of exercising control over addressing the hazards of the Reliance piping within the scope of work for Brammer, Jaguar and Reliance. The Reliance piping should have been pressure tested and Jaguar or Reliance was responsible for conducting the pressure testing.

OSHA's expert concedes that depressurizing the well would not have presented any hazards to TCP employees if Jaguar used the correct valve-sequencing at the time of the accident. Tr: 564:12-565:1. TCP did not have any involvement or control over the procedure Jaguar was supposed to follow to relieve the well pressure. OSHA's expert admits that it was not foreseeable to TCP that Jaguar's safe procedure would not be followed at the time of the accident. Tr: 570:13-18, 564:12-565:6. Thus, TCP, the wireline operator, cannot be reasonably expected to exercise control over the hazardous condition of the corroded Reliance piping, the decision to pressurize the Reliance piping, or the procedures Brammer and Jaguar should have used to relieve the well pressure.

**B.** **TCP did not have the requisite knowledge of any actual violative conditions**

The ALJ misapplied the law in finding that TCP had actual knowledge of the hazardous condition based on the employees' knowledge that were working near the Reliance piping. Even assuming there was a properly defined recognized hazard, the Secretary must also prove that either (1) TCP had actual knowledge of a violative condition, or (2) TCP had constructive knowledge such that it could have learned of the violative condition with the exercise of reasonable diligence.[4] *Secretary v. Asplundh Tree Expert, LLC*, 2023 WL 7318191, *14-16 (No. 21-0497, 2023); *Otis Elevator Co.*, 21 BNA OSHC 2204, 2207 (No. 03-1344, 2007); *Tampa Shipyards Inc.*, 15 BNA OSHC 1533, 1537 (No. 86-360, 1992) (Consolidated). The Secretary failed to meet her burden because she did not define a specific violative or hazardous condition in the citation, but rather defined the violative conditions as the absence of certain abatement methods. Whether TCP had knowledge that two possible abatement methods were not used is irrelevant to whether TCP had knowledge of the hazardous condition created by the corroded piping.

A safety hazard at the worksite is a condition that creates or contributes to an *increased risk* that an event causing death or serious bodily harm to employees will occur. *Baroid Div. of NL Indus., Inc. v. OSHRC*, 660 F.2d 439, 444 (10th Cir. 1981) (emphasis added). Working around pressurized equipment is a normal activity in the industry that does not, in and of itself, create or contribute to an *increased* risk of a serious injury to TCP's employees. The record contains no evidence of any alleged specific hazardous conditions TCP knew or should have known about.

---

[4] The ALJ erroneously held that TCP had actual knowledge of the improperly defined violative condition and did not analyze whether TCP may have had constructive knowledge of the actual violative condition. TCP will address the lack of constructive knowledge of the actual violative condition here in case the Court addresses that issue. Decision at pg. 24, footnote 30.

The ALJ's reliance on *Phoenix Roofing* is misplaced, particularly since *Phoenix Roofing* involved a specific standard, not the general duty clause. *Phoenix Roofing, Inc.*, 17 BNA OSHC 1076, 1079-80 (No. 90-2148, 1995); (Dec. 23). The ALJ observed that the employer in *Phoenix Roofing* had knowledge of the violative condition in that case because the supervisor "knew that Phoenix employees worked in proximity to unguarded skylights while positioning and storing materials." (Dec. 23). To establish a violation under a specific standard, the Secretary must only prove that Respondent was aware of the actual condition constituting a violation under the cited standard. For a specific standard, the Secretary is not required to prove the employer knew the violative condition was hazardous. Working near unguarded skylights may be a violative condition under the applicable specific standard, but that condition is not analogous to a general duty case.

Under the terms of the general duty clause, the Secretary must prove more than knowledge of the violative condition. Instead, the Secretary must prove that the employer had knowledge that the condition *was hazardous*. The Secretary must establish Respondent's knowledge of a general duty clause violation by establishing either its actual or constructive knowledge of the hazard or that it could have learned of the hazard with the exercise of reasonable diligence. *Otis Elevator Co.,* 21 BNA OSHC 2204, 2207 (No. 03-1344, 2007); *Tampa Shipyards Inc.,* 15 BNA OSHC 1533, 1537 (No. 86-360, 1992) (consolidated). While TCP knew its employees were working in close proximity to pressurized equipment, TCP did not have actual or constructive knowledge that working near the Reliance piping was hazardous because it did not know or have reason to know the piping was corroded.

i.  <u>TCP did not have actual knowledge that the corroded Reliance piping was being pressurized without being inspected or pressure tested by Brammer, Reliance and/or Jaguar.</u>

The ALJ erred in finding that TCP had actual knowledge of a violative condition because working in proximity to pressurized equipment is not, in and of itself, hazardous. It was undisputed at trial that TCP and the other contractors' employees routinely worked in close proximity to pressurized equipment, including a pressurized lubricator and pressurized frac stack, without line restraints or a buffer zone. The testimony of the witnesses demonstrates that such work was a normal activity in the oil and gas industry. Tr: 549:25-551:19, 583:6-584:10; 382:10-385:17. Unlike knowingly working near unguarded skylights, simply working near pressurized equipment, if a safe valve-sequencing procedure and non-corroded piping were used, is not a hazardous condition.

Significantly, OSHA's expert did not recognize a hazard in working near other pressurized equipment such as the pressurized lubricator and pressurized frac stack even though no line restraints are used on the lubricator nor is a buffer zone imposed around the lubricator. Tr: 549:25-551:19, 583:6-584:10. Likewise, merely working near pressurized equipment when bleeding down a well cannot be a violative condition. OSHA's expert conceded that working with and around pressurized lubricator piping and a pressurized frac stack with no line restraints or a buffer zone was common and accepted in the industry, despite the struck-by

hazards that could be encountered if, for example, the lubricator piping ruptured.[5]

The ALJ misapplied the law in finding that TCP had actual knowledge of the hazardous condition. Rather than *Phoenix Roofing*, the facts of this case are analogous to those in *Secretary v. Asplundh Tree Expert, LLC*, 2023 WL 7318191 (No. 21-0497, 2023*)*, and the reasoning in that decision should apply here. In *Asplundh Tree* (a General Duty Clause case—as opposed to *Phoenix Roofing*, which arose under the specific fall protection standard), the court found that the Respondent acknowledged the general hazards associated with trimming dead trees, but that Respondent did not have knowledge of the *actual violative condition*, which arose when an employee performed an errant back cut on a tree. *Asplundh Tree Expert, LLC*, 2023 WL 7318191, *16 (No. 21-0497, 2023*)*. Likewise, here the ALJ ruled that Respondent knew of certain general hazards associated with bleeding down a well, but the ALJ also found that TCP had no knowledge of the valve-sequencing procedure to be used by Jaguar, whether the piping would be pressurized, the corroded condition of the Reliance piping or whether it had been pressure-tested. Decision at pgs. 11-12.

Simply bleeding down a well is not and cannot be the *violative condition* that led to the increased risk of the hazards. The violative condition in *Asplundh Tree*

---

[5] Importantly, working near the pressurized lubricator and pressurized frac stack were not cited conditions in this case, even though such work presented the same potential hazards as working near pressurized piping when bleeding down a well. The only difference is that the frac stack and lubricator were properly inspected and pressure-tested before being used to bleed down the well.

arose when the employee made an errant back cut. Here, the actual violative condition arose when Brammer and Jaguar decided to pressurize the corroded Reliance piping in preparation to bleed down the well without first inspecting and pressure testing it. Tr: 519:20-520:9, 529:4-6, 535:5-536:7; See *Asplundh Tree Expert, LLC*, 2023 WL 7318191, *16 (No. 21-0497, 2023*).

In addition, Section 7.11.3 of API RP 54 only recommends the use of line restraints or a buffer zone where the benefit of these measures is identified pursuant to a risk assessment. The Secretary's expert admits that TCP is not expected to participate in this risk assessment. Tr: 545:6-24; 585:9-20. TCP cannot reasonably be expected to have actual knowledge that API RP 54 recommends the use of line restraints or a buffer zone if it did not participate in the risk assessment to make that determination.

Though TCP pressure tested the lubricator, TCP did not have the authority or expertise to inspect or test *all* pressurized equipment owned by other companies at the jobsite which did not involve the use of TCP's tools, including the corroded Reliance piping. Tr: 370:5-371:21, Tr:550-551, 542:3-544:22, 541:15-25, 535:5-536:7, 531:2-5, 630:15-631:18. As confirmed by OSHA's expert, TCP reasonably expected that, if the Reliance piping were to be pressurized, it would have been properly pressure tested and maintained in good operating condition by Jaguar or

Reliance, and that Brammer would ensure that this was done before using the Reliance piping.  Tr: 542:6-543:17, 584:15-585:20, Tr:629:5-631:18, 370:5-20.

### ii. TCP did not have constructive knowledge of the corroded Reliance piping because it reasonably relied on Brammer, Reliance and/or Jaguar to inspect and maintain the piping in good operating condition

The ALJ misapplied the law in finding that TCP had actual knowledge of the violative condition and therefore did not determine whether TCP had constructive knowledge.[6]  However, to the extent must not be addressed, TCP also did not have constructive knowledge of the corroded Reliance piping.  There was no reason TCP should have known the Reliance piping was corroded to the extent that it would rupture upon being pressurized.  To prove constructive knowledge, the Secretary must show that TCP could have discovered the alleged violative condition with the exercise of reasonable diligence.  See Precision Concrete Constr., 19 BNA OSHC 1404, 1407 (No. 99-0707, 2001) (noting that Secretary has burden of identifying what reasonable diligence required).   No evidence was offered by the Secretary to support a finding that TCP had constructive knowledge that the Reliance piping was not in a good operating condition.

The Commission holds that "…in exercising reasonable diligence, a contractor may rely in part upon the assurances of a subcontractor to protect against hazards.  In many situations in the workplace, it is natural for an employer to rely upon the specialist to perform the work related to the specialty in accordance with

---

[6] The ALJ erroneous held that TCP had actual knowledge of the improperly defined violative condition and did not analyze whether TCP may have had constructive knowledge of the actual violative condition.  TCP will address the lack of constructive knowledge of the actual violative condition here in case the Court addresses that issue.  Decision at pg. 24, footnote 30.

OSHA standards." *Sec'y of Labor v. Sasser Electric & Manufacturing Company*, 11 BNA OSHC 2133, 2137 (No. 82-178, 1984); *Martin Construction, Inc.*, 2007 WL 4963590, at *7 (No. 06-0700, March 5, 2007). Here, TCP reasonably relied on the expertise of the specialists, Brammer, Jaguar and Reliance, to ensure the Reliance piping was in good operating condition.

The Review Commission has long recognized that an owner or controlling employer may rely on the expertise of a specialty contractor to abate a hazard to which other employees are exposed. In this case, TCP is neither the owner nor controlling employer, however TCP was nonetheless reasonable in relying on the expertise of the controlling employer, Brammer, and the creating/correcting employer, Jaguar, to provide the appropriate equipment and follow the appropriate procedure to safely bleed off the pressure from the well. There was no evidence of prior safety-related problems caused by Brammer or Jaguar that would have given TCP a reason not to rely on those companies. In fact, one of the TCP employees, Brian Walker, had worked with Brammer several times before without any safety concerns. Tr:133:6-134:8.

TCP did not have the authority or the expertise to ensure that the Reliance piping was rigged up or maintained safely. Tr:379:14-17. Under *Sasser* and its progeny, the Commission has held that an employer will be "justified in relying upon the specialist to protect against hazards related to the specialist's expertise so

long as the reliance is reasonable and the employer has no reason to foresee that the work will be performed unsafely." *Sasser Elec. & Mfg. Co.,* 11 BNA OSHC 2133, 2137 (No. 82-178, 1984). Reliance owned the corroded piping and knew or should have known of its condition. Jaguar installed the Reliance piping and was responsible for pressure testing the piping and following the procedure to safely bleed down the well. Brammer was the controlling employer and was responsible for making the decision to use the Reliance piping. Brammer was also responsible for pressurizing the Reliance piping and developing and implementing the procedure to be followed to safely bleed down the well. As OSHA's expert admits, TCP could not have foreseen the Jaguar operator failing to follow the procedure in place for safely using the Reliance piping to bleed pressure from the well. TCP could not have foreseen that Brammer, Reliance and Jaguar would not pressure test the Reliance piping before it was pressurized. Nor could TCP have foreseen that Reliance would provide deteriorated piping that was inadequate for the task for which it was used.

In *Sasser*, the Commission ruled that the employer could not have foreseen a violation even though Sasser's employees gave hand signals and directions to the crane operator whom Sasser hired to perform crane work. Here, TCP did not have *any* expertise, involvement or control over the inspection or condition of the Reliance piping. Nor did TCP have any role in the decision of whether line

restraints should be used on the Reliance piping or the decision to pressurize the Reliance piping. The CSHO, James Jacob, conceded that TCP did not have a responsibility to inspect the Reliance piping for its operating condition or for the presence of line restraints. Tr: 605:23-606:2. In addition, OSHA's expert admitted that TCP would not be expected to participate in the risk assessment that is necessary to determine whether the Reliance piping needed line restraints. Tr: 545:6-24.

OSHA's expert also testified that the Reliance piping should have been pressure tested before it was pressurized. Tr: 542:6-543:17. OSHA's expert also concedes that Jaguar and Reliance had the responsibility to pressure test the Reliance piping and, if they had done so, the hazards faced by the TCP employees in the accident would not have occurred. Tr: 542:6-543:17, 584:15-585:20. Moreover, as OSHA's expert testified, the valve sequencing was controlled by Jaguar. Tr: 532:5-8. OSHA's expert confirmed that Brammer instructed the Jaguar employees what to do regarding the proper valve-sequencing. Tr: 532:5-24. OSHA's expert himself did not expect the Brammer company man, Sullivan, to "stand there … and …make sure that the hydraulic actuator is open first before the manual valve." Tr: 532:5-24. As OSHA's expert concedes, TCP—as the wireline operator—was certainly not responsible for ensuring the valves were opened in the

correct order where not even the controlling employer had this responsibility. Tr: 532:5-24.

As such, there was no reason for TCP, through the exercise of reasonable diligence applicable to a wireline operator, to suspect the use of Reliance piping created a hazardous condition due to its corroded condition. Additionally, TCP also had no reason to suspect that the unforeseeable failure to follow the safe procedure used earlier in the day to relieve pressure from well without pressurizing the Reliance piping would not be followed at the time of the accident.

TCP reasonably relied on Brammer, Jaguar and Reliance to pressure test the Reliance piping before the decision was made to pressurize the Reliance piping. Tr: 629:5-631:18. The Reliance supervisor, Scott Edwards, testified that he was told by the Brammer company man that the Reliance piping would not be pressurized, but rather used only to vent with little or no pressure placed on the piping. Tr: 263:1-24, 265:1-18. Consistent with its industry practice, TCP was not involved in the decision to use the Reliance piping because wireline operators do not have a role in this decision. Tr: 271:7-23, 369:7-370:11. The Secretary presented no evidence showing that anyone from TCP was aware or should have been aware that the Reliance piping would be pressurized or that the Reliance piping had not been properly pressure tested. Tr: 526:11-24; 157:2-23.

In fact, the Secretary concedes that TCP was not the controlling, creating or correcting employer with respect to the conditions relating to the use of the Reliance piping and the violative conditions in this case. Tr: 604:18-21. Rather, TCP's role was limited to performing wireline operations. Wireline operations are a discrete task and API RP 54, the document the Secretary cites for her proposed abatement methods, contains a section covering the job tasks and safety-related responsibilities for wireline operators. See Ex. C-28, Section 10.5, pg. 50 of 63. As OSHA's expert himself testified, nothing in the Wireline Operations section of API RP 54 requires TCP to inspect pressurized piping for corrosion, line restraints or imposes a buffer zone for the Reliance piping. Tr: 581:14-583:5.

Notably, the Citation does not allege that TCP violated any of the API 54 provisions specifically related to Wireline Operations. In fact, the only references to buffer zones or line restraints in the API 54 Wireline Operations section relate to the wireline itself and these wireline-related hazards, as OSHA's expert admits, were not cited in this case. Tr: 581:14-583:5. TCP's expertise and control were limited to wireline operations and equipment, such as the lubricator inside which TCP's tools would be used. The Secretary did not allege that TCP failed to comply with any safety-related obligations contained in API RP 54's Wireline Operations section. As a result, because it was not a wireline operation, TCP reasonably relied on the controlling employer, Brammer, and the other specialty contractors, Jaguar

and Reliance, to inspect the condition of the Reliance piping, pressure test the Reliance piping and to follow the procedure put in place by Brammer and Jaguar to safely depressurize the well.

Importantly, OSHA's expert concedes that TCP **could not have foreseen** that Jaguar would change the safe valve-sequencing procedure it had safely used earlier in the day to a different procedure that required the Reliance piping to be pressurized:

> **JUDGE GATTO: Is it my understanding that you testified that if the other company had properly sequenced turning off those particular valves, that there would -- the accident would not have occurred; is that what you said?**
>
> **THE WITNESS: Yes, that's correct.**
>
> **JUDGE GATTO: And I believe -- correct me if I'm wrong. Did you testify that the fact that they did not sequence them properly was not foreseeable by TCP?**
>
> **THE WITNESS: Not by TCP, no, Your Honor.**
>
> **JUDGE GATTO: Okay. So there would not have been a hazard if they had properly sequenced, I guess is my question?**
>
> **THE WITNESS: Yes, Your Honor, that's correct.**

Tr: 564:12-565:1; <u>see also</u> Tr.570:13-18. (emphasis added)

This admission proves that TCP had no reason, by way or expertise, control or time, to know that its employees were exposed to a hazard, and further demonstrates that TCP's reliance on Brammer, Jaguar and Reliance regarding the safe valve-sequencing procedure to depressurize the well was reasonable. The Courts are clear that "OSHA does not impose absolute (or strict) liability on employers for harmful workplace conditions; instead, it focuses liability where harm can, in fact, be prevented." *ComTran Grp., Inc.*, 722 F.3d 1304, at 1306 (11th Cir. 2013). The ALJ misapplied the law in finding that TCP had the requisite knowledge of the hazard. Further, the ALJ's finding was not supported by substantial evidence.

## C. The Secretary failed to prove a feasible and effective means of abatement

To show that a proposed safety measure will materially reduce a hazard, the Secretary must submit evidence proving, as a threshold matter, that the methods undertaken by the employer to address the alleged hazard were inadequate. *United States Postal Serv. Nat'l Ass'n of Letter Carriers*, 21 O.S.H. Cas. (BNA) ¶ 1767 (OSHRC Nov. 20, 2006). Where, as here, "an employer has existing safety procedures, the burden is on the Secretary to show that those procedures are inadequate," *SeaWorld v. Perez*, 748 F.3d 1202, 1215 (D.C. Cir. 2014), as measured against the precautions "a reasonably prudent employer familiar with the

circumstances of the industry" would take. Id. at 1207 (quoting *Fabi Constr.*, 508 F.3d at 1081).

The Secretary did not prove that TCP's existing safety measures outlined above were inadequate as measured against the precautions a reasonably prudent employer familiar with the circumstances of the industry would take. Where the Secretary fails to show any such inadequacy in the employer's existing abatement method, a violation of the general duty clause has not been established. *See Alabama Power Co.*, 13 BNA OSHC 1240, 1987 CCH OSHD ¶ 27,892 (No. 84-357, 1987) (citation alleging insufficient safety rules vacated where employer's safety program was not inadequate).

Commission case law requires that the Secretary must specify the proposed abatement measures that would be effective in materially reducing the *incidence* of the hazard." *Beverly Enters., Inc.*, 19 BNA OSHC 1161 (OSHRC October 27, 2000) (emphasis added). Incidence is defined by the dictionary.com as "The rate or range of occurrence or influence of something, especially of something unwanted." https://www.dictionary.com/browse/incidence. Line restraints and buffer zones will not reduce the "incidence" of the hazard of a line rupture because buffer zones and line restraints do not decrease the likelihood of the occurrence, rate or frequency of the hazard, i.e. the rupture of the corroded Reliance piping.

Preventing the line rupture altogether, which should have been accomplished by Jaguar, Reliance and/or Brammer pressure testing the Reliance piping and/or following the safe and effective valve-sequencing procedure, are superior abatement methods to merely attempting to mitigate exposure to the hazard by using line restraints or a buffer zone.  According to OSHA's Field Operations Manual, "[a] citation will not be issued merely because the Agency is aware of an abatement method different from that of the employer, if the proposed method would not reduce the hazard significantly more than the employer's method."  <u>See</u> OSHA FOM, Chapter 4, Section III.B.8, [https://www.osha.gov/fom/chapter-4](https://www.osha.gov/fom/chapter-4).  Here, pressure testing the Reliance piping and Brammer/Jaguar's procedure for reducing pressure were effective means of preventing the "incidence" of the line from rupturing.  The TCP employees provided uncontradicted testimony that they had no reason to believe the other contractors would not follow the same safe valve-sequencing process used earlier that day at the time of the accident.  Tr: 145:14-146:9, 225:19-226:17, 373:6-374:3.

OSHA's expert admitted that the use of a buffer zone requires a risk assessment and the size of the buffer zone requires "a lot of calculations."  Tr: 546:21-548:21.  He further admitted that his proposal of OSHA's proposed "100-foot" buffer zone around the Reliance piping was an arbitrary figure that was not based on an industry standard.  Tr: 548:1-21.  That the Secretary conceded OSHA's

expert's "100-foot" buffer zone is not set forth anywhere in API RP 54, the industry standard cited by the Secretary for her proposed abatement methods. Tr: 548:1-21. See Missouri Basin, 2018 WL 1309482 at *6 (OSHRC Mar. 1, 2018) (Holding that, like here, the cited API standard did not appear to have been intended to address the circumstances at issue). In contrast, Respondent's expert testified that in his 41 years of experience, he has never seen a 100-foot buffer zone around pressurized pump iron and that such a requirement would be impossible given the work requirements of the companies involved. Tr: 640:15-641:2.

Whether a buffer zone is required and how large it should be is a technical/scientific question. Missouri Basin Well Service, Inc., 2018 WL 1309482, at *6 (OSHRC Mar. 1, 2018) (Holding that whether increasing the spacing between the pump and tank from 30 feet to 100 feet would materially reduce the chances of a fire occurring is a technical/scientific question but the secretary failed to quantify the rate at which the risk decreases as the amount of distance increases). The Secretary presented no scientific or technical analysis showing that his proposed "100-foot" buffer zone would have materially reduced any of the alleged hazards in this case, nor did he provide any scientific/technical analysis contradicting Respondent's expert testimony that such a buffer zone is not feasible for TCP's employees to perform their required tasks. The ALJ finding that the proposed buffer zone would have abated the hazard is not supported by substantial evidence.

# CONCLUSION

For the reasons stated herein, the decision in this case should be overturned.

Respectfully submitted,

/s/ Darren S. Harrington
Darren S. Harrington (Bar No. 2400232)
Brian Hurt (Bar No. 24012876)
Steptoe & Johnson PLLC
500 North Akard Street, Suite 3200
Dallas, TX 75201
Ph:     (214) 251-8170
Fax:    (214) 393-4099
Email: Darren.Harrington@Steptoe-Johnson.com
        Brian.Hurt@Steptoe-Johnson.com
*Counsel for Petitioner*

# CERTIFICATE OF COMPLIANCE

This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

This brief contains 11,342 words.

This brief complies with the typeface and type style requirements because:

This brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [14 pt Times New Roman]

Dated: December 8, 2025

/s/Darren S. Harrington

*Counsel for Petitioner*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 8th day of December, 2025, I caused this Brief of Appellant to be filed electronically with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Amy S. Tryon
Office of the Solicitor
U.S. Department of Labor
525 Griffin Street, Suite 501
Dallas, TX 75202
Email:  tryon.amy@dol.gov

*Counsel for Respondent*

I further certify that on this 8th day of December, I caused a copy of Brief of Petitioner, TCP Specialists LLC to be served, via Electronic Mail, upon counsel for Respondent, Amy S. Tryon, Office of the Solicitor, U.S. Department of Labor at the above address.

/s/ Darren S. Harrington
*Counsel for Petitioner*