ORAL ARGUMENT NOT YET SCHEDULED

# No. 25-1173

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**TCP SPECIALISTS, LLC,**

Petitioner,

v.

**SECRETARY OF LABOR,**

Respondent.

On Petition for Review of a Final Order
of the Occupational Safety and Health Review Commission
(Administrative Law Judge John B. Gatto)

**BRIEF FOR THE SECRETARY OF LABOR**

JONATHAN BERRY
Solicitor of Labor

EDMUND C. BAIRD
Associate Solicitor for
  Occupational Safety and Health

HEATHER R. PHILLIPS
Counsel for Appellate Litigation

AMY S. TRYON
Senior Attorney
U.S. Department of Labor
200 Constitution Ave., NW, Room S-4004
Washington, DC 20210
(202) 693-5447

January 7, 2026

**CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1)(A), Respondent Secretary of Labor certifies as follows:

**A. Parties**

All parties, intervenors, and amici appearing in this court are listed in the Brief for Petitioner TCP Specialists, LLC, except that the proper Respondent in this case is the Secretary of Labor, not the Occupational Safety and Health Review Commission.

**B. Ruling Under Review**

References to the ruling at issue appear in the Brief for Petitioner TCP Specialists, LLC.

**C. Related Cases**

This case has not previously been before this or any other Court. The Secretary is not aware of any related cases currently pending in this Court or any other Court.

# TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**................................................ii

**TABLE OF AUTHORITIES** ...................................................................v

**GLOSSARY**……………………………………………………………………viii

**STATEMENT OF JURISDICTION**.............................................. 2

**STATEMENT OF THE ISSUES PRESENTED** ................................ 2

**RELEVANT STATUTE**............................................................. 3

**STATEMENT OF THE CASE** ..................................................... 4

    I. Procedural History ........................................................... 4

    II. Statutory Background ..................................................... 4

**STATEMENT OF FACTS**............................................................ 6

       A.    The Workover................................................................ 7

       B.    The Events of December 5, 2022 ................................. 9

       C.    The OSHA Inspection and Citation ......................... 14

       D.    The ALJ Decision.........................................................15

**SUMMARY OF THE ARGUMENT** .............................................19

**ARGUMENT**...........................................................................20

**I.**      **Standard of Review**...........................................................20

**II.**     **Substantial Evidence Supports the ALJ's Affirmance of the General Duty Clause Violation Against TCP** .................................22

A. The Hazard of Fire/Explosion/Being Struck by Projectiles During Depressurization of the Well Existed at TCP's Workplace ...........................23

B. TCP's Attacks on the ALJ's Characterization of the Hazard Misapply Commission Case Law and Should Be Rejected ............................................25

C. Substantial Evidence Supports the ALJ's Finding that Use of a Buffer Zone is a Feasible Means of Abating the Hazard in this Case ...............................30

D. Substantial Evidence Supports the ALJ's Conclusion that TCP Had Actual Knowledge of the Conditions Constituting the Violation ..............................32

**III. TCP's As-Applied Constitutional Challenge to the General Duty Clause Fails**...........................................................................................................34

**CONCLUSION** .........................................................................................36

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF SERVICE**

**TABLE OF AUTHORITIES**

**Cases:**                                                                                          **Page:**

*A.H. Sturgill Roofing, Inc.*,
  No. 13-0244, 2019 WL 1099857 (OSHRC Feb. 28, 2019) ...............................16

*AJP Constr., Inc. v. Sec'y of Labor*,
  357 F.3d 70 (D.C. Cir. 2004) ........................................................................21

*Arcadian Corp.*,
  No. 93-0628, 2004 WL 2218388 (OSHRC Sept. 30, 2004) ................... 15, 23, 28

*Baroid Div. of NL Indus., Inc. v. OSHRC*,
  660 F.2d 439 (10th Cir. 1981) .....................................................................23

*Beverly Enters., Inc.*,
  19 BNA OSHC 1161 (No. 91-3144, 2000) ....................................................26

*\*BHC Nw. Psych. Hosp., LLC v. Sec'y of Labor*,
  951 F.3d 558 (D.C. Cir. 2020) ....................................... 5, 17, 22, 28, 30, 31, 34

*Bomac Drilling*,
  9 BNA OSHC 1682 (No. 76-450, 1981) ........................................................26

*Brennan v. OSHRC*,
  494 F.2d 460 (8th Cir. 1974) ........................................................................26

*Champlin Petroleum Co. v. OSHRC*,
  593 F.2d 637 (5th Cir. 1979) ........................................................................17

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966) ......................................................................................21

*Dover Elevator Co.*,
  No. 91-862, 1993 WL 275823 (OSHRC July 16, 1993) ............................ 32, 33

*Dun-Par Engineered Form Co.*,
  No. 82-928, 1986 WL 53522 (OSHRC July 30, 1986) ....................................32

*Ensign-Bickford Co. v. OSHRC*,
717 F.2d 1419 (D.C. Cir. 1983) ...................................................................34

*Fabi Constr. Co. v. Sec'y of Labor*,
508 F.3d 1077 (D.C. Cir. 2007) ........................................................ 16, 20, 21

*Mid South Waffles, Inc., d/b/a/ Waffle House #1283*, No. 13-1022,
2019 WL 990226, at *2 (OSHRC Feb. 15, 2019) ....................................... 23, 29

*Integra Health Mgmt., Inc.*,
No. 13-1124, 2019 WL 1142920 (OSHRC Mar. 4, 2019) ................................23

*Martin v. OSHRC*,
499 U.S. 144 (1991) .........................................................................................6

*Nat'l Realty & Constr. Co. v. OSHRC*,
489 F.2d 1257 (D.C. Cir. 1973) ...................................................... 17, 23, 28, 34

*Otis Elevator Co. v. Sec'y of Labor*,
762 F.3d 116 (D.C. Cir. 2014) ........................................................................21

*P. Gioioso & Sons, Inc. v. OSHRC*,
115 F.3d 100 (1st Cir. 1997) ...........................................................................21

*Pelron Corp.*,
No. 82-388, 1986 WL 53616 (OSHRC June 2, 1986) ................................... 15, 27

*Regina Constr. Co.*,
No. 87-1309, 1991 WL 104227 (OSHRC May 15, 1991) ................................ 5, 22

*SeaWorld of Fla., LLC v. Perez*,
748 F.3d 1202 (D.C. Cir. 2014) .............................................. 5, 16, 22, 27, 29, 35

*Tampa Shipyards, Inc.*,
No. 86-360, 1992 WL 52938 (OSHRC Mar. 10, 1992) ....................................32

*Waldon Health Care Ctr.*,
Nos. 89-2804 & 89-3097, 1993 WL 119662 (OSHRC Apr. 2, 1993)................23

*Whirlpool Corp. v. OSHRC,*
  645 F.2d 1096 (D.C. Cir. 1981) ................................................................21

**Statutes:**

5 U.S.C. § 706(2)(A) ................................................................................21
29 U.S.C. § 651(b) ....................................................................................4
29 U.S.C. § 654(a)(1) ........................................................................ 3, 4, 5
29 U.S.C. § 659(a) ....................................................................................5
29 U.S.C. § 659(c) ..................................................................................2, 6
29 U.S.C. § 660(a) ............................................................................... 2, 20
29 U.S.C. § 661(j) ....................................................................................4, 6

**Regulations:**

29 C.F.R. § 2200.90(d) ............................................................................6
29 C.F.R. § 2200.90(f) .............................................................................4
29 C.F.R. § 2200.91(a) .............................................................................6
30 C.F.R. § 250.601 ................................................................................7

*The authorities on which the Secretary chiefly relies are marked with an asterisk.*

# GLOSSARY

| | |
|---|---|
| Administrative Law Judge | ALJ |
| Occupational Safety and Health Act of 1970 | OSH Act |
| Occupational Safety and Health Administration | OSHA |

## STATEMENT OF JURISDICTION

This matter arises from an Occupational Safety and Health Administration (OSHA) enforcement proceeding before the Occupational Safety and Health Review Commission (Commission). The Commission had jurisdiction pursuant to section 10(c) of the Occupational Safety and Health Act of 1970 (OSH Act or Act), 29 U.S.C. § 659(c). The Commission's June 11, 2025 final order affirmed one OSHA citation issued to TCP Specialists, LLC (TCP). TCP filed its petition for review of the Commission's final order with this Court on August 8, 2025, within the sixty-day period prescribed by the OSH Act. 29 U.S.C. § 660(a). This Court has jurisdiction over this appeal pursuant to section 11(a) of the Act, 29 U.S.C. § 660(a). Venue is appropriate because the OSH Act authorizes employers to obtain review of Commission final orders in the Court of Appeals for the District of Columbia Circuit. *Id*.

## STATEMENT OF THE ISSUES PRESENTED

1. Whether substantial evidence supports the ALJ's finding that working in close proximity to a gas well that is being depressurized poses the hazard of fire, explosion, and being struck by projectiles in the event of a pipe rupture, where experienced employees at the worksite and the expert witnesses for both sides agreed that such a hazard was present.

2.    Whether substantial evidence supports the ALJ's finding that implementing a buffer zone around the gas well undergoing depressurization was a feasible means of abating the hazard, where expert testimony established that a reasonably prudent employer would have designated a buffer zone and that a buffer zone of 100 feet would have materially reduced the hazard to TCP employees.

3.    Whether substantial evidence supports the ALJ's finding that TCP had knowledge of the conditions constituting the cited OSH Act general duty clause violation, where a TCP supervisor was part of the group who decided to depressurize the gas well, the same supervisor instructed TCP employees to stand near the well, and a supervisor's knowledge is imputable to the employer.

4.    Whether TCP was afforded fair notice of its obligations under the general duty clause of the OSH Act.

## RELEVANT STATUTE

"Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."

29 U.S.C. § 654(a)(1).

**STATEMENT OF THE CASE**

## I.    Procedural History

This case stems from a December 2022 OSHA inspection of a TCP worksite located at a horizontal gas well, the Blackstone B1 well, in San Augustine County, Texas.  Following the inspection, OSHA issued TCP a citation alleging one violation of the OSH Act's general duty clause, 29 U.S.C. § 654(a)(1).

TCP timely contested the citation and the case was assigned to Commission ALJ John B. Gatto, who held a three-day hearing and issued a decision affirming the citation on April 28, 2025.  TCP filed a petition for discretionary review of the ALJ's decision with the Commission on June 2, 2025.  The Commission did not grant review and the ALJ's decision therefore became a Commission final order by operation of law on June 11, 2025.  *See* 29 U.S.C. § 661(j); 29 C.F.R. § 2200.90(f).  TCP filed a timely petition for review of the Commission's final order with this Court on August 8, 2025.

## II.    Statutory Background

The OSH Act is intended "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources."  29 U.S.C. § 651(b).  To achieve the Act's purposes, Congress authorized the Secretary of Labor "to set mandatory occupational safety and health standards" with which employers must comply.  *Id.* §§ 651(b)(3), 654(a)(2), 655.

4

The OSH Act also contains a general duty clause, which requires an employer to provide a work environment "free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." *Id.* § 654(a)(1). To prove a violation of the general duty clause, the Secretary must show that a condition or activity in the workplace presented a hazard; the employer or its industry recognized the hazard; the hazard was causing or likely to cause death or serious physical harm; and that there exists a feasible means of eliminating or materially reducing the cited hazard. *BHC Nw. Psych. Hosp., LLC v. Sec'y of Labor*, 951 F.3d 558, 563 (D.C. Cir. 2020); *SeaWorld of Fla., LLC v. Perez*, 748 F.3d 1202, 1207 (D.C. Cir. 2014). In addition, the Commission requires the Secretary to establish that the cited employer knew or, with the exercise of reasonable diligence, could have known that the hazardous condition existed at its worksite. *See Regina Constr. Co.*, No. 87-1309, 1991 WL 104227, at *2 (OSHRC May 15, 1991).

OSHA enforces both its standards and the general duty clause by issuing citations to employers when violations occur. 29 U.S.C. § 659(a). Violations are characterized as "serious," "other-than-serious," "willful," or "repeated." *Id*. § 666(a)-(c). In appropriate cases, OSHA also proposes civil penalties against cited employers.

If an employer contests an OSHA citation, the matter is adjudicated by the Commission, an independent adjudicatory body. *See* 29 U.S.C. §§ 659, 661; *see also Martin v. OSHRC*, 499 U.S. 144, 152 (1991) (Commission is a "neutral arbiter" for adjudicating disputes between employers and OSHA). Initially, an ALJ appointed by the Commission hears the dispute. *See* 29 U.S.C. §§ 659(c), 661(j). A party adversely affected by the ALJ's decision may petition for discretionary review of the decision by the Commission. *See* 29 U.S.C. § 661(j); 29 C.F.R. § 2200.91(a). If the Commission does not grant review, the ALJ's decision becomes a final order of the Commission by operation of law. 29 C.F.R. § 2200.90(d). Final orders of the Commission are reviewable in the courts of appeals. 29 U.S.C. §§ 659(c), 660(a), (b).

## STATEMENT OF FACTS

This case arises from an incident that occurred on December 5, 2022, at the Blackstone B1 well site. The Blackstone B1 well is a horizontal gas well located in San Augustine County, Texas, operated by C6 Operating, LLC (C6). Stip. Fact 6.[1] The well was completed in approximately June 2021 and produced gas until approximately October 2022. *See* Ex. C-18.

---

[1] The parties' Stipulated Facts are found in *Pretrial Order*, Attachment C (filed June 21, 2024).

## A. The Workover

In October 2022, production from the well dropped, and C6 hired a number of different contractors to perform a workover.[2] Stip. Fact 7. Brammer Engineering, Inc., was hired to provide a company man, Hershell "Buster" Sullivan, to supervise and direct the workover operations. Stip. Fact 8. Various other companies were hired to perform specific operations and provide specialized equipment for the workover. Jaguar Energy Services, LLC (Jaguar), a flowback[3] and well-testing company, provided flowlines (or flowback iron),[4] the frac stack,[5] and other flowback equipment. Tr. 64-65. Reliance Well Services, Inc. (Reliance)

---

[2] Workover operations are "the work conducted on wells after the initial completion for the purpose of maintaining or restoring the productivity of a well." 30 C.F.R. § 250.601; *see* Tr. 319 ("workover" in the oil and gas industry is a general term that can refer to numerous operations after a well is drilled, including repairs to a producing well).

[3] A "flowback operation" is defined by American Petroleum Institute Recommended Practice 54 ("API 54"), as "[t]he process of allowing fluids to flow from the well following a treatment, either in preparation for a subsequent phase of treatment or in preparation for cleanup and returning the well to production." Ex. C-28 at § 3.1.32.

[4] The term "iron" generally refers to joints of pipe that are connected to the well and through which fluids can be delivered to or removed from the well. Tr. 53-54. At trial, "iron" was colloquially referred to as iron, pump iron, pipe, or line. Tr. 53-54, 144-45, 476.

[5] A frac stack is a set of valves and fittings connected to the top of a well to direct and control the flow of formation fluids from the well. Tr. 47-48; *see* Ex. C-9A (marked yellow bracket identifying the frac stack).

was hired to provide multiple services and various equipment, including a workover rig, pump tank, and pipe (or "pump iron") that was used to bleed pressure off the well.  Stip. Fact. 10, *see* Tr. 250-51.  Eastern Energy Services provided a grease unit and lubricator, and Branton Oil Tools provided a packer.  Tr. 41-42.  A packer is similar to a plug and is a device that can be placed inside the well so gas or other fluids can be directed to flow through specific tubing to production lines to be sold.  Tr. 39.

TCP was hired to provide wireline services to set the packer.  Tr. 37-38, 317.  "Wireline" refers to a wire or cable that can be used for a variety of operations including to run and retrieve tools from the well or set a packer.  Tr. 51-52; *see* Ex. C-28 at 3.1.91 (defining "wireline" as "[a] special wire or wire rope used to convey a tool(s) into and out of a wellbore").

During the workover, it was discovered that an issue with the casing[6] in the well was likely responsible for the drop in production.  Tr. 435.  On or about November 25, 2022, after casing integrity had been restored, Jaguar rigged up their flowback equipment, including the frac stack and flowlines.  Ex. C-21 at 8.  From December 1 through the morning of December 5, 2022, Jaguar flowed back fluids

---

[6] Casing is "[p]ipe installed in the wellbore and cemented … in place to retain the borehole dimension and seal off hydrocarbon and water-bearing formations").  Ex. C-28 at 3.1.9.

8

from the well to clean the well up and test the production levels. *Id.* at 13-17; Ex. C-20; *see* Tr. 436-37, 438-39.

## B.     The Events of December 5, 2022

On December 5, 2022, TCP arrived at the worksite about 6 a.m. Tr. 319; *see* Ex. C-16 (narrative report written by Jason Walker in January 2023). The TCP crew that day comprised Jason Walker ("Supervisor Walker"), who was the supervisor and wireline engineer, Tr. 317-18, and wireline operators Charles Brian Walker ("B. Walker") and Tristan McLelland ("McLelland"). Tr. 38, 168.



*Fig. 1 Aerial picture of Blackstone B1 worksite. Ex. C-8 at 1.*

9

Shortly after arriving, the TCP crew met with Sullivan, the company man, to determine when and where to rig up[7] for the wireline operation. Tr. 66-67. Before rigging up, the TCP crew met with some of the other contractors and discussed the location of equipment, the well pressure, and the need to stay clear of overhead loads, but did not discuss setting up buffer zones around pressurized equipment or restraining the pump iron. Tr. 346-48.

The pump tank had previously been rigged up to the frac stack with Jaguar's flowback iron, or piping. Jaguar's pipes had been restrained, or secured, until they were removed on the morning of December 5. Stip. Facts 12, 13; Tr. 293, 345. Reliance pipe (pump iron) was then rigged up from the frac stack to the pump tank to be used for bleeding off the well. Stip. Fact 12. Although Reliance had chains at the worksite to restrain the joints on its pump iron, they were not used the day of the accident. Tr. 293-94, 345. TCP's crew was not informed of the decision to use Reliance's pump iron and was not aware of the pump iron's condition. Tr. 271-74.

**The First Run.** At approximately 8 or 9 a.m., the TCP crew positioned the wireline unit and started rigging up their equipment for the first "run" of the day. Tr. 68-69; 120; 207. TCP's crew and Eastern's crew assembled Eastern's

---

[7] "Rig up/rig down" is defined by API 54 as "[t]he on-site erection and connection of equipment and components in preparation for drilling or well servicing operations and the taking apart of equipment for storage and portability prior to moving off the rig floor or location." Ex. C-28 at § 3.1.66.

lubricator and Eastern ran pressure-rated grease through the lubricator to contain the wellbore pressure so that TCP could safely lower its tools into the well.  Tr. 43-44.  The crane hoisted the grease head and lubricator containing the tools up and "stabbed" them onto the well.  Tr. 70-72, 173.  Supervisor Walker completed the first run in approximately two hours.  Tr. 73, 179, 325-26, 329.

At the end of the first run, TCP pulled its tools up into the lubricator, the upper master valve on the frac stack was closed, and pressure was bled off from the equipment above the upper master valve.  Tr. 76.  "Bleeding off" or "bleeding down" in the oil and gas industry refers to relieving pressure from a system.  Tr. 77-78, 467.  During a bleed off, pressure is released from the well through joints of pipe connected from the frac stack to a pump tank and then into the atmosphere. Tr. 77, 312, 467-69.

Bleeding off, or depressurizing, a well carries a risk of fire, explosion, and struck-by hazards.  *See* Tr. 122, 207, 324 (employee testimony about the hazards associated with bleeding off a well, including pipe rupture and "line whip," which was what occurred in this case).  The Secretary's expert, Paul Luker, who has worked in the oil and gas industry for more than 40 years, testified that bleeding down a well presents fire, explosion, and struck-by hazards because of the risk that pipes could rupture.  Tr. 471-72.

11

**The Second Run.**  Around 1 p.m., while the crew was assembling the equipment for the second run (during which the packer was to be placed), Supervisor Walker, Sullivan, and some Branton employees held a meeting near the wireline truck.  Tr. 320-21.  Supervisor Walker was slightly concerned because the well pressure was higher rather than stable or decreasing.  Tr. 81, 330.  The group decided that pressure in the well would be bled off after the packer was set and while TCP was pulling the wireline tools out of the well.  Tr. 321.  Supervisor Walker was aware of the hazards associated with bleeding off a well, which include "the pipe blow[ing] up" or whipping about.  Tr. 324.

TCP had trouble setting the packer, and it took them approximately four or five hours.  Tr. 82; *see* Ex. C-21 at 17.  Eventually, the packer was set at a depth of approximately 10,750 feet.  Ex. C-16 at 1; Ex. C-20 at 6.  At some point, Supervisor Walker and McLelland noticed that no one was bleeding down the well, despite the plan that had been made to do so.  Supervisor Walker asked McLelland to check the pressure in the well and, upon learning it had increased, to inform Sullivan.  Tr. 95-96, 192-93, 335; Ex. C-16 at 2.  When McLelland informed Sullivan that the well had not yet been bled off, Sullivan said they needed to let the rest of the crew know, and they headed to the well together.  Tr. 193.  Around this same time, Supervisor Walker sent B. Walker to tell Sullivan that the tools were still in the well and not to close the master valves on the frac stack.  Tr. 98-99.

12

While McLelland and B. Walker were standing near the frac stack, a number of other employees from the well crew joined them at the wellhead to discuss the operations. Tr. 194-95, 199-200. Sullivan directed Scott Edwards, a Reliance employee, to go close the choke manifold on the pump tank, where the Reliance pipe connected to the pump tank, so Edwards could check the pressure in the well on a gauge at the pump tank. Tr. 280-81, 302-03. Once the choke manifold was closed, Edwards signaled that to Sullivan by making a thumbs-up. Tr. 281. Sullivan then told Josh Terwillegar, the Jaguar supervisor, to open a valve on the frac stack at the accumulator. Tr. 558-59.



*Fig. 2. Screenshot from Ex. C-12 of the pipe rupture.*

Opening the valve released the well pressure into the pump iron. Tr. 559. The pressure in the pump iron caused it to rupture at or near the choke on the pump tank and then whip around violently. Tr. 324, 623-24, 626; *see* C-12 (video of

13

incident).  The whipping pipe hit several employees standing near the pipe and frac stack, throwing one as far as approximately 60 feet and hitting B. Walker in the head.  Tr. 107; *see also* Exs. C-8 at 2, C-12, & C-20 at 6.  Ultimately, two employees died as a result of their injuries, and three more, including B. Walker, were hospitalized.  Tr. 598; Ex. C-16 at 2; Ex. C-20 at 6.

## C.     The OSHA Inspection and Citation

OSHA conducted an inspection of the worksite and issued TCP a citation alleging one violation of the OSH Act's general duty clause, 29 U.S.C. § 654(a)(1). The citation (as amended) charged that TCP employees "were exposed to fire, explosion, and struck-by hazards while depressurizing a frac stack."  *See* Order Granting Mot. to Amend Compl. and Citation.  As feasible means of abatement, the citation offered two options from American Petroleum Institute Recommended Practice 54 (API 54), entitled "Occupational Safety and Health for Oil and Gas Well Drilling and Servicing Operations," which states, "All flowlines and relief lines should be restrained to prevent potential whipping of lines or a designated buffer zone established."  *Id.*  The citation noted that TCP employees were standing in close proximity to the frac stack during the depressurization operation and that the flowlines were not restrained.  *Id.*

14

**D.     The ALJ Decision**

The ALJ held a three-day hearing and subsequently issued a decision affirming the citation.  Decision 2.  On the first element of a general duty clause violation, existence of a hazard, he noted that the parties had agreed in pre-trial stipulations that "TCP Specialists employees were exposed to a st[r]uck-by hazard created by the ruptured Reliance pipe on December 5, 2022."  Decision 7; *see* Stip. Fac*t* 20.  Although TCP argued that the hazard should be defined with reference to the fact that the pipe used by Reliance was possibly corroded, the ALJ explained that "[i]n general duty clause cases, the proximate cause of the accident does not determine the definition of the hazardous condition."  Decision 8 (citing *Arcadian Corp.*, No. 93-0628, 2004 WL 2218388, at *9 (OSHRC Sept. 30, 2004)).  The ALJ agreed with the Secretary that the hazard in this case was the risk of fire, explosion, and struck-by hazards that accompanies depressurizing activities.  *Id.*  He also rejected TCP's argument that "working around pressurized equipment" cannot be a hazard because it "is a normal activity in the oil and gas industry," noting case law holding that normal and inherently dangerous activities can constitute hazards where there is a way for the employer to prevent or reduce the likelihood of danger to employees.  Decision 10 (citing *SeaWorld*, 748 F.3d at 1210-11).  The ALJ explained that TCP mischaracterized the Commission case of *Pelron Corp.*, No. 82-388, 1986 WL 53616 (OSHRC June 2, 1986).  "Nothing [] in *Pelron*

15

immunizes a workplace's dangerous 'normal activities' from oversight; the Commission simply applied well-established law that only 'preventable' hazards can be considered as recognized." *SeaWorld*, 748 at 1211 (citing *Pelron*, 1986 WL 53616, at *3).

The second element of a general duty clause case requires the Secretary to establish that the cited employer or the employer's industry recognized the relevant workplace condition to be hazardous. *SeaWorld*, 748 F.3d at 1207 (citing *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007)). Here the ALJ noted Supervisor Walker's testimony that he was aware that bleeding off wells was associated with hazards such as pump iron exploding, rupturing, and whipping around. Decision 11-12. In addition, the expert witnesses for both parties "testified that the hazards existed once the pump iron was pressurized and that all the contractors at the wellsite would have recognized pressure-related hazards caused by bleeding down the well." Decision 12. The ALJ therefore concluded the Secretary had established the recognition element.

As to the third element, that the hazard in question was likely to[8] or actually did cause death or serious physical harm, *see SeaWorld*, 748 F.3d at 1207, the ALJ

---

[8] The Secretary is not required "to show that an accident is likely but rather that *if* an accident were to occur, death or serious physical harm would be the likely result." *A.H. Sturgill Roofing, Inc.*, No. 13-0244, 2019 WL 1099857, at *2 (OSHRC Feb. 28, 2019) (citation omitted).

found that the injuries and deaths that occurred as a result of the hazard in this case satisfied the Secretary's burden of proof. Decision 13.

The fourth element of a general duty clause violation, feasible means of abatement, requires the Secretary to "specify the particular steps a cited employer should have taken to avoid citation" and "demonstrate the feasibility and likely utility of those measures." *BHC Nw. Psych. Hosp.*, 951 F.3d at 563-64 (quoting *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1268 (D.C. Cir. 1973)). The ALJ accordingly evaluated the two methods of abatement that OSHA had proposed in the citation: (1) restraining the flowlines so they would be unable to whip around and (2) using a buffer zone to keep employees a safe distance from the frac stack. *See* Decision 7, 13-14. He noted that the Secretary must demonstrate the "feasibility and likely utility" of her proposed measure(s) – in other words, that a measure is capable of being implemented and that it would have effected a material reduction of the risk. *See* Decision 13 (quoting *Champlin Petroleum Co. v. OSHRC*, 593 F.2d 637, 640 (5th Cir. 1979)).

The ALJ rejected the Secretary's contention that restraining the flowlines was a feasible means of abatement for TCP. Decision 14. Although the oil and gas industry recognizes and often uses line restraints as a method to abate the explosion, fire, and struck-by hazards associated with bleeding off wells, *see id.*, he found that TCP's role at the Blackstone wellsite, as one of multiple subcontractors

with a limited scope of authority, rendered TCP incapable of employing line restraints in those particular circumstances. "TCP employees had no direct role in bleeding down the well such that they could control the line restraints." *Id.*

However, the ALJ concluded that the Secretary's second proposed means of abatement, use of a buffer zone, both was feasible for TCP and would have materially reduced the explosion/fire/struck-by risk to TCP employees. Decision 15. In reaching this conclusion the ALJ accepted the testimony of the Secretary's expert witness, Paul Luker, whom the ALJ had qualified as an expert in the oil and gas industry with specific focus on workover operations. *See* Decision 8 n. 17. Luker testified that TCP both could and should have performed its own assessment as to whether a buffer zone was necessary for its employees, that a reasonably prudent employer would have established a designated buffer zone, and that a buffer zone of 100 feet would have materially reduced the hazard to TCP employees. Decision 16-17. On the last of those points, the ALJ noted both that TCP's expert agreed that 100 feet would be sufficient to reduce the risk and that non-TCP employees who were standing more than 100 feet away from the frac stack were not injured. Decision 17, 19. (As depicted in Figure 2, *supra* p. 13, TCP employees and the others who were injured and killed were standing right next to the frac stack when the pipe ruptured.)

Finally, the ALJ determined that TCP had actual knowledge of the conditions constituting the violation – that is, that its employees were in close proximity to a well that was being bled off. Decision 23-24. He explained, "TCP does not dispute that Supervisor Walker knew McLelland[] and B. Walker were standing near the pressurized equipment because he directed them to do so." Decision 23. As part of the group that decided to bleed down the well, Supervisor Walker was aware that the well was pressurized and that depressurization was soon to occur. *Id.* The ALJ likened this case to one where the Commission held that the employer had actual knowledge of the violative conditions where a supervisor "knew that Phoenix employees worked in proximity to unguarded skylights while positioning and storing materials." Decision 23 (quoting *Phoenix Roofing, Inc.*, No. 90-2148, 1995 WL 82313, at *4 (OSHRC Feb. 24, 1995)).

Having found the Secretary established all the elements of a general duty clause violation, the ALJ affirmed the citation against TCP.

## SUMMARY OF THE ARGUMENT

Substantial evidence in the record supports the ALJ's decision affirming the general duty clause violation against TCP. Testimony from TCP employees and from expert witnesses for both parties in this case establishes that working in close proximity to a gas well that is undergoing depressurization poses a risk of fire, explosion, and being struck by pipes or projectiles in the event of a pipe rupture.

TCP's varied challenges to the ALJ's characterization of the hazard all misinterpret Commission and Court of Appeals case law and obscure the essential point that a hazard is properly citable under the general duty clause where it is preventable – which this one was.

Here, the ALJ correctly found that the Secretary had established that use of a buffer zone to separate TCP employees from the frac stack during depressurization both was feasible and would have materially reduced the hazard faced by TCP employees. TCP knew about the hazardous condition through Supervisor Walker, who knew the well was about to be bled off, but even so sent employees to stand near the frac stack. Substantial evidence therefore supports the ALJ's conclusion that TCP violated the general duty clause. TCP's as-applied constitutional challenge to the general duty clause fails because this Court has repeatedly held that constitutional fair notice concerns are adequately addressed by the existing jurisprudence limiting the reach of the general duty clause to preventable hazards. This Court should therefore affirm the decision of the ALJ and deny TCP's petition for review.

## ARGUMENT

### I.     Standard of Review

This Court reviews the Commission's factual findings under the substantial evidence standard. 29 U.S.C. § 660(a); *Fabi Constr. Co. v. Sec'y of Labor*, 508

F.3d 1077, 1081 (D.C. Cir. 2007); *Otis Elevator Co. v. Sec'y of Labor*, 762 F.3d 116, 120-21 (D.C. Cir. 2014). Where the Commission does not direct review of an ALJ's decision, the ALJ's findings become the Commission's, and the substantial evidence standard "applies with undiminished force" to the ALJ's findings. *P. Gioioso & Sons, Inc. v. OSHRC*, 115 F.3d 100, 108 (1st Cir. 1997).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966) (internal quotations omitted); *see also AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 73 (D.C. Cir. 2004); *Whirlpool Corp. v. OSHRC*, 645 F.2d 1096, 1101 (D.C. Cir. 1981). Under this standard, the Court "must uphold the Commission's decision even if [the Court] would have reached a different result upon *de novo* review." *Fabi*, 508 F.3d at 1081 (citing *Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 923 (D.C. Cir. 2005)).

The Commission's legal determinations are to be overturned only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); *Fabi*, 508 F.3d at 1080. In addition, this Court must accept the Commission's credibility findings unless they are "patently unsupportable." *Fabi*, 508 F.3d at 1081 (quotations and citations omitted).

## II.     Substantial Evidence Supports the ALJ's Affirmance of the General Duty Clause Violation Against TCP.

To prove a violation of the general duty clause, the Secretary must show that a condition or activity in the workplace presented a hazard; the employer or its industry recognized the hazard; the hazard was causing or likely to cause death or serious physical harm; and that there exists a feasible means of eliminating or materially reducing the cited hazard. *BHC Nw. Psych. Hosp.*, 951 F.3d at 563; *SeaWorld*, 748 F.3d at 1207.  In addition, the Secretary must establish that the cited employer knew or, with the exercise of reasonable diligence, could have known that the hazardous condition existed at its worksite. *See Regina Constr. Co.*, 1991 WL 104227, at \*2.  The ALJ's conclusion that the Secretary satisfied her burden and established that TCP violated the general duty clause in this case is supported by substantial evidence and should be affirmed.[9]

---

[9] In its brief to this Court, TCP does not challenge the ALJ's finding that the hazard was likely to cause death or serious physical harm.  TCP also makes no challenge to the ALJ's finding that TCP recognized the hazard in question, apart from erroneously stating that the ALJ relied on an industry consensus standard to establish recognition.  *Compare* Pet. Br. 28 with Decision 11-12 (finding recognition based on direct testimony from TCP supervisory employee).  This brief accordingly focuses on the three remaining elements of a general duty clause violation: the existence of a hazard, TCP's actual or constructive knowledge of the conditions constituting that hazard, and the existence of a feasible means of abatement.

**A.    The Hazard of Fire/Explosion/Being Struck by Projectiles During Depressurization of the Well Existed at TCP's Workplace.**

Substantial evidence supports the ALJ's finding that a hazard existed at the Blackstone B1 well worksite.  A hazard, for purposes of the general duty clause, is a worksite condition that creates or contributes to an increased risk that an event causing death or serious bodily harm to employees will occur.  *See Baroid Div. of NL Indus., Inc. v. OSHRC*, 660 F.2d 439, 444 (10th Cir. 1981).  The Commission has held a "hazard means a danger, peril or risk arising out of the employee's work."  *Integra Health Mgmt., Inc.*, No. 13-1124, 2019 WL 1142920, at *5 (OSHRC Mar. 4, 2019).  "[T]he existence of a hazard is established if the hazardous incident can occur under other than a freakish or utterly implausible concurrence of circumstances."  *Waldon Health Care Ctr.*, Nos. 89-2804 & 89-3097, 1993 WL 119662, at *11 (OSHRC Apr. 2, 1993) (citing *Nat'l Realty*, 489 F.2d at 1265 n.33).

Additionally, a "hazard must be defined in a way that apprises the employer of its obligations, and identifies conditions or practices over which the employer can reasonably be expected to exercise control."  *Mid South Waffles, Inc., d/b/a Waffle House #1283*, No. 13-1022, 2019 WL 990226, at *2 (OSHRC Feb. 15, 2019).  A hazard is not defined by the absence of a particular abatement method but "in terms of the physical agents that could injure employees."  *Arcadian Corp.*,

2004 WL 2218388, at * 8 (quoting *Chevron Oil Co.*, No. 10799, 1983 WL 23864, at *2 n.6 (OSHRC Apr. 20, 1983)) (cleaned up).

As noted above, TCP agreed in a pre-trial stipulation that "TCP Specialists employees were exposed to a st[r]uck-by hazard created by the ruptured Reliance pipe on December 5, 2022." Decision 7; Stip. Fact 20. Thus, TCP has conceded that a hazard existed at the worksite, satisfying the Secretary's first element of proof.

Even without the stipulation, substantial evidence in the record supports the ALJ's finding that TCP employees were exposed to fire, explosion, and struck-by hazards when they stood in close proximity to the frac stack and pressured piping while the well was being bled off. Bleeding off, or depressurizing, a well is an activity or condition that inherently creates or contributes to the risk of fire, explosion, and struck-by hazards. *See* Tr. 122, 207, 324 (employee testimony about the hazards associated with bleeding off a well, including pipe rupture and "line whip," which was what occurred in this case). The Secretary's expert, Luker, who has worked in the oil and gas industry for more than 40 years, testified that bleeding down a well presents fire, explosion, and struck-by hazards because of the risk that pipes could rupture. Tr. 471-72. Indeed, TCP's expert, Jarold Elgin, agreed that bleeding down a well presents hazards, including struck-by hazards.

24

Tr. 639, 642, 662.  This testimony constitutes substantial evidence supporting the

ALJ's finding that a hazard existed at the worksite.[10]

**B.      TCP's Attacks on the ALJ's Characterization of the Hazard Misapply Commission Case Law and Should Be Rejected.**

Despite having conceded the presence of a hazard at the Blackstone B1

worksite, TCP argues to this Court that the "Secretary and the ALJ failed to

properly define the hazard at issue."  Pet. Br. 17.  Specifically, TCP faults the

Secretary and the ALJ for not referring to the alleged corroded condition of the

pipe that eventually ruptured when defining the hazard.  Pet. Br. 15.  This

argument fails.  As the ALJ correctly observed, TCP's focus on the condition of

the pipe is an attempt to emphasize what may have been the cause of the accident

in this case.  Decision 8 (explaining that the hazardous condition in a general duty

clause case is to be defined without reliance on the proximate cause of any

accident that occurred).

While it is understandable that TCP prefers to direct attention to factors,

such as the condition of the pipe, that were not under its control, the cause of the

accident in this particular case – that is, what caused the pipe to rupture – is not

relevant to the presence or absence of the cited hazard at TCP's worksite.  Indeed,

---

[10] The hazard is not, as TCP repeatedly phrases it, "working in proximity to pressurized equipment."  *See, e.g.*, Pet. Br. 35.  The depressurization activity is key to the existence of the hazard.

no accident need have occurred at all for the hazard to be present. *See Bomac Drilling*, 9 BNA OSHC 1682, 1691-92 (No. 76-450, 1981) (consolidated) ("Under section 5(a)(1) case law, the 'hazard' that must be 'recognized' is not a particular set of circumstances at a specific location and specific point in time but rather the broader, more generic or general hazard."), *overruled on other grounds by United States Steel Corp.*, 10 BNA OSHC 1752 (No. 77-1796, 1982); *Brennan v. OSHRC*, 494 F.2d 460, 463 (8th Cir. 1974) (Secretary need not prove general hazard was cause of the accident that gave rise to the citation); *Beverly Enters., Inc.*, 19 BNA OSHC 1161, 1171 (No. 91-3144, 2000) (same). The hazard in this case is the risk of fire, explosion, or being struck by projectiles if the pipe does in fact rupture for whatever reason, and this hazard is well known in the oil and gas industry generally and by TCP supervisors specifically. Accordingly, TCP's contention that the ALJ should have described the hazard in terms of the cause of the accident should be rejected.[11]

Next, TCP argues that depressurizing a well cannot be a hazard under the general duty clause because it is "intentional, normal activity in the oil and gas

---

[11] The same reasoning disposes of TCP's argument, Pet. Br. 38-45, that its reasonable reliance on the other subcontractors at the site to use piping that was in good operating condition absolves it of any responsibility under the general duty clause. The cause of the accident does not define the hazard and TCP is being held responsible for only what it could control – its employees' proximity to the frac stack during depressurization.

industry" that cannot be avoided.  Pet. Br. 17-18.  TCP cites the following language from the Commission case of *Pelron* to argue that the ALJ defined the hazard too broadly: "Obviously, some industrial activities are by their very nature dangerous.  To permit the normal activities in such an industry to be defined as a 'recognized hazard' is to eliminate an element of the Secretary's burden of proof" Pet. Br. 18 (quoting *Pelron*, 1986 WL 53616, at \*3).  However, this Court has explained that the above-cited discussion in *Pelron* is simply an application of the long-standing principle that general duty clause coverage is limited to preventable hazards.  "Nothing [] in *Pelron* immunizes a workplace's dangerous 'normal activities' from oversight; the Commission simply applied well-established law that only 'preventable' hazards can be considered as recognized." *SeaWorld*, 748 at 1211 (citing *Pelron*, 1986 WL 53616, at \*3).  In *Pelron* the alleged hazard was "the possibility" of accumulation of harmful vapors, and the Commission held that phrasing the hazard in that way made it such that the employer could never prevent the hazard.  1986 WL 53616, at \*3.  Here, by contrast, the hazard is a preventable one because TCP could have protected its employees from the force of a ruptured pipe through use of a buffer zone.  TCP's argument that the ALJ defined the hazard too broadly therefore fails.

TCP also accuses the ALJ of improperly characterizing the hazard in terms of absence of the methods that would be used to abate the hazard.  Pet. Br. 25.

This would be improper because "[a] hazard is not defined in terms of the absence of a particular abatement method" but rather "in terms of the physical agents that could injure employees." *Arcadian Corp.*, 2004 WL 2218388, at *8 (cleaned up) (noting error of ALJ in finding that three separate hazards existed where employer had failed to implement three separate proposed means of abatement). Specifically, TCP contends that the ALJ's reference to the "proximity of employees to pressurized equipment" when discussing the hazard improperly defines the hazard as the absence of a buffer zone. Pet. Br. 25 (citing Decision 10). This argument, too, fails.

TCP is trying to have it both ways – first, they argue that the hazard is defined too broadly to be preventable (Pet. Br. 18), and then they argue that the hazard is defined too particularly because it identifies a condition to which their employees were exposed (Pet. Br. 25). The point of both requirements in the case law – that the hazard describe conditions the employer can control and that the hazard not be defined by the absence of the abatement – is to limit the reach of the general duty clause to preventable hazards because the general duty clause is not meant to impose strict liability. "The duty [is] to be an achievable one. . . . Congress intended to require elimination only of preventable hazards." *Nat'l Realty*, 489 F.2d at 1266; *see also BHC Nw. Psych. Hosp.*, 951 F.3d at 566 (fair notice concerns are alleviated by requiring the employer to remove only

28

preventable hazards from the workplace and tying feasible abatement methods to what a reasonably prudent employer would do); *SeaWorld*, 748 F.3d at 1216 (rejecting SeaWorld's claim that it lacked fair notice that abatement measures would be required because "the hazard arising from trainers' close contact with killer whales in performance is preventable"). The ALJ's factual findings in this case make plain that the hazard in question is preventable, obfuscation by TCP notwithstanding. Put simply:

- The *hazard* in this case is the risk of fire, explosion, or being struck by projectiles during well depressurization.

- The *condition or practice over which TCP can reasonably be expected to exercise control* (*see Mid South Waffles*, 2019 WL 990226, at *2) is its employees' proximity to the frac stack during depressurization.

- The *feasible means of abatement* of the hazard is for TCP to implement a buffer zone, i.e., to designate and enforce a minimum distance its employees must keep clear from the frac stack during depressurization.

The theme of the argument throughout TCP's brief is that there is much about the situation at the Blackstone wellsite that was not in their control. That is true, but they did control their own employees' proximity to the well. And because TCP knew that the well was being depressurized and that depressurization carries the hazard of fire, explosion, and being struck by projectiles, they were required

29

under the OSH Act to do what was in their control to abate the hazard. They could have implemented a buffer zone for their employees and they did not. That is the basis for the general duty clause violation here.

**C.      Substantial Evidence Supports the ALJ's Finding that Use of a Buffer Zone is a Feasible Means of Abating the Hazard in this Case.**

To establish a feasible means of abatement in a general duty clause case, "the Secretary must 'specify the particular steps a cited employer should have taken to avoid citation' and 'demonstrate the feasibility and likely utility of those measures.'" *BHC Nw. Psych. Hosp.*, 951 F.3d at 563-64 (quoting *Nat'l Realty*, 489 F.2d at 1268). Here, the ALJ found that one of the two abatement methods the Secretary had proposed in the citation, use of a buffer zone to keep TCP employees a safe distance from the frac stack during depressurization, satisfied these criteria. Substantial evidence supports this conclusion.

In finding that use of a buffer zone both was feasible for TCP and would have materially reduced the explosion/fire/struck-by risk to TCP employees, the ALJ accepted the testimony of the Secretary's expert witness, who testified that TCP both could and should have performed its own assessment as to whether a buffer zone was necessary for its employees, that a reasonably prudent employer would have established a designated buffer zone, and that a buffer zone of 100 feet would have materially reduced the hazard to TCP employees. Decision 16-17. On the last of those points, the ALJ noted both that TCP's expert agreed that 100 feet

would be sufficient to reduce the risk and that non-TCP employees who were standing more than 100 feet away from the frac stack were not injured. Decision 17, 19.

TCP challenges the ALJ's conclusion by alleging without evidence that it already had sufficient safety measures in place. Pet. Br. 45-46 (referring without citation to "existing safety measures outlined above"). Where "'an employer has existing safety procedures, the burden is on the Secretary to show that those procedures are inadequate,' as measured against the precautions 'a reasonably prudent employer familiar with the circumstances of the industry' would take." *BHC Nw. Psych. Hosp.*, 951 F.3d at 563-64 (quoting *SeaWorld*, 748 F.3d at 1215, 1207). It is unclear which "existing safety measures" TCP believes were sufficient, but in any event the ALJ found that TCP had no work rules or policies for working around pressurized equipment or establishing buffer zones. Decision 16-17 & n.26.

TCP also suggests that it would have been "superior" for the other companies involved to have prevented the line rupture altogether. Pet. Br. 47. While this may be, the Secretary's obligation is to establish a feasible method by which TCP could have eliminated or materially reduced the hazard faced by its own employees. The ALJ found that implementation of a buffer zone met these criteria.

Finally, TCP declares that "[w]hether a buffer zone is required and how large it should be is a technical/scientific question" and faults the Secretary for not providing "scientific/technical analysis" to support her position. Pet. Br. 48. The Secretary put on an expert witness, Paul Luker, whom the ALJ qualified as an expert in the oil and gas industry with specific focus on workover operations. *See* Decision 8 n. 17. TCP identifies no case law or indeed any persuasive reasoning why Luker's expert testimony should not count as "substantial evidence" supporting the ALJ's conclusion here. Accordingly, this Court should uphold the ALJ's finding that the Secretary established a feasible means by which TCP could have abated the hazard in this case.

**D.     Substantial Evidence Supports the ALJ's Conclusion that TCP Had Actual Knowledge of the Conditions Constituting the Violation.**

Knowledge of the violative condition is required to establish a general duty clause violation. *See Tampa Shipyards, Inc*., No. 86-360, 1992 WL 52938, at \*6 (OSHRC Mar. 10, 1992). To prove this element, the Secretary must show that the employer knew, or with the exercise of reasonable diligence could have known, of the violative conditions. *Id.*; *Dun-Par Engineered Form Co.*, No. 82-928, 1986 WL 53522, at \*4 (OSHRC July 30, 1986). Actual or constructive knowledge can be imputed to an employer through its supervisory employees. *Dover Elevator Co.*, No. 91-862, 1993 WL 275823, at \*7 (OSHRC July 16, 1993).

The ALJ found that TCP had actual knowledge of the conditions constituting the violation – that is, that its employees were in close proximity to a well that was being bled off – through Supervisor Walker. Decision 23-24. "TCP does not dispute that Supervisor Walker knew McLelland[] and B. Walker were standing near the pressurized equipment because he directed them to do so." Decision 23. And, as part of the group that decided to bleed down the well, Supervisor Walker was aware that the well was about to undergo depressurization. *Id.* Supervisor Walker's knowledge is imputable to TCP, *Dover Elevator Co.*, 1993 WL 275823, at *7, and establishes that, through him, TCP was aware of the violative conditions.

Supervisor Walker had done this type of operation before. Tr. 321-22. He was aware of the hazards associated with bleeding off a well, which include "the pipe blow[ing] up" or whipping about. Tr. 324. Walker was a part of the management group that decided to bleed off the well after the second run. Tr. 320-21; *see* Ex. C-16 ("the decision was made by myself, the Branton tool hand and Mr. Sullivan to slowly bleed pressure off the well after setting the packer"). Later, after the packer was set and while TCP was pulling its tools out of the well, Walker had a TCP employee check the pressure in the well to confirm whether the well had been bled off. Tr. 334-35. When the employee reported that there was approximately 3,000 psi on the well, Walker knew the well had not been bled off yet and instructed the employee to go and inform Sullivan. Tr. 336. In sum,

33

Supervisor Walker knew the well was going to be bled off when it was and was well aware of the hazards associated with this activity.

In discussing this element of the violation, TCP again improperly focuses on the cause of the accident, which it presumes to be the corroded Reliance pipe. Pet. Br. 35. As explained above, however, the condition that violated the general duty clause here was the presence of TCP employees in close proximity to the frac stack during depressurization of the well; the cause of the specific accident in this case is irrelevant. The ALJ's finding that TCP had knowledge of the violative conditions is therefore supported by substantial evidence and should be affirmed.

## III. TCP's As-Applied Constitutional Challenge to the General Duty Clause Fails.

TCP's argument that the general duty clause is unconstitutionally vague as applied to its workplace in this case, Pet. Br. 24-25, is baseless. This Court has specifically rejected as-applied challenges to the general duty clause numerous times, noting that its construction of the clause as "requiring only that employers eliminate 'preventable hazards' likely to cause death or serious injury to employees . . . provides employers with sufficiently specific notice of the requirements of the general duty clause." *Ensign-Bickford Co. v. OSHRC*, 717 F.2d 1419, 1421 (D.C. Cir. 1983) (quoting *Nat'l Realty*, 489 F.2d at 1265-66); *see also BHC Nw. Psych. Hosp.*, 951 F.3d at 566 (fair notice concerns are alleviated by requiring the employer to remove only preventable hazards from the workplace and tying

34

feasible abatement methods to what a reasonably prudent employer would do);

*SeaWorld*, 748 F.3d at 1216 (rejecting as-applied challenge and finding employer had fair notice "because the hazard arising from trainers' close contact with killer whales in performance is preventable"). TCP neither addresses this dispositive case law nor offers any reason why its situation should be treated differently. *See* Pet. Br. 24-25. Accordingly, the argument should be rejected.

**CONCLUSION**

For the foregoing reasons, the Court should deny the petition for review and

affirm the final order of the Commission.

Respectfully submitted,

JONATHAN BERRY
Solicitor of Labor

EDMUND C. BAIRD
Associate Solicitor for
  Occupational Safety and Health

HEATHER R. PHILLIPS
Counsel for Appellate Litigation

/s/ *Amy S. Tryon*
AMY S. TRYON
Senior Attorney
U.S. Department of Labor
200 Constitution Ave., NW
Room S-4004
Washington, DC 20210
(202) 693-5447
tryon.amy.s@dol.gov

**CERTIFICATE OF COMPLIANCE**

I hereby certify that Respondent Secretary of Labor's Brief contains 7,902 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B). The font used was Times New Roman 14-point proportional spaced type. This Brief was prepared using Microsoft Word 2022.

/s/ Amy S. Tryon
AMY S. TRYON
Senior Attorney
U.S. Department of Labor
200 Constitution Ave., NW
Room S-4004
Washington, DC  20210
(202) 693-5447

January 7, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2026, I filed a copy of the foregoing brief via the Court's electronic filing system, providing service on all registered counsel, including the following counsel for Petitioner:

Darren S. Harrington
Steptoe & Johnson PLLC
500 North Akard St., Suite 3200
Dallas, TX 75202
(214) 251-8005
Darren.Harrington@Steptoe-Johnson.com

/s/ Amy S. Tryon
AMY S. TRYON
Senior Attorney
U.S. Department of Labor
200 Constitution Ave., NW
Room S-4004
Washington, DC 20210
(202) 693-5447
tryon.amy.s@dol.gov

January 7, 2026